Magno J. ORTEGA, M.D.,
Plaintiff–Appellee,

v.

Dennis Michael O'CONNOR, M.D. and
Richard Friday, Defendants–
Appellants.

No. 97–15073.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 9, 1998.

Decided June 26, 1998.

# 1150

Paul T. Hammerness, Deputy State Attorney General, San Francisco, California, for the defendants-appellants.

Gilbert T. Graham, San Francisco, California, for the plaintiff-appellee.

Before: D.W. NELSON, REINHARDT, and WIGGINS, Circuit Judges.

REINHARDT, Circuit Judge:

In 1981, defendants Dr. Dennis Michael O'Connor and Richard Friday, who were then officials at California's Napa State Hospital, directed an extensive inquiry that they contend was a lawful administrative investigation of Dr. Magno Ortega's management practices. The investigation led to a highly intrusive search of Dr. Ortega's private office and all of the personal possessions he kept there, among which were private letters and romantic mementos. In the course of the search, the defendants seized most of the items that were in Dr. Ortega's office, including the items mentioned above, and maintained custody over them for a period of many months. Dr. Ortega, a longtime employee of the Hospital, questioned the defendants' motives, took exception to some of their more intrusive investigatory tactics, retained a lawyer to try to get his personal possessions back, and ultimately filed a timely action, claiming violations of his civil rights. Some sixteen years later, after a lengthy series of rulings and appeals, Dr. Ortega prevailed, obtaining a jury verdict holding the defendants liable under 42 U.S.C. § 1983 for conducting an unreasonable search and seizure. The defendants now appeal, contending primarily that the district court erred in denying them a qualified immunity defense and in holding prior to trial that their seizure of certain romantic mementos from Dr. Ortega's office was unreasonable as a matter of law. We affirm.

## I

Dr. Magno Ortega, a licensed physician and psychiatrist, held the position of Chief of Professional Education at Napa State Hospital from 1964 to late 1981. In that capacity, he supervised the training of the resident physicians specializing in psychiatry. During 1981, two events occurred that prompted Hospital officials to commence an investigation into his management practices. That investigation led to the searches and seizures that are the subject of this case.

First, in March 1981, at the suggestion of several residents, Dr. Ortega purchased a new computer for use in the Hospital's residency training program. The residents donated money to cover about half the cost and Dr. Ortega paid the rest. About a month later, when Dr. Ortega asked Dr. O'Connor, the Hospital's Executive Director, to sign some thank-you letters for persons who had made donations for the computer and for subpurchase orders to obtain accessories for the computer, Dr. O'Connor became concerned about whether the computer had been properly donated to the Hospital.

Second, a couple of months after the purchase of the computer, Dr. Ortega placed Dr. Richard Vaughan, a resident at the Hospital, on involuntary leave for failing to report for his scheduled rotation. In response to Dr. Ortega's actions, Dr. Vaughan told Personnel Director Dorothy Owen that he believed that Dr. Ortega had placed him on leave because he had not contributed to the purchase of the computer and because he had urged other residents to ask for their money back. On July 29, 1981, Ms. Owen told Dr. O'Connor about Dr. Vaughan's complaint.

Later that day, Dr. O'Connor wrote a memorandum to Mr. Richard Friday, the Hospital Administrator, asking him to initiate an investigation into Dr. Ortega's handling of these issues. In the memorandum, Dr.

O'Connor cited two reasons for the investigation: (1) the circumstances surrounding Dr. Ortega's acquisition of the computer; and (2) the complaint of Dr. Vaughan. The next day, Dr. O'Connor authorized Friday to select an investigative team, and granted the investigative team broad authority, including the right to search Dr. Ortega's office, despite the fact that the Hospital had no policy that allowed Hospital staff to enter private offices of employees without their consent. Similarly, while the Hospital did have a policy of taking routine inventory of state property in the offices of terminated employees, it did *not* have a policy of taking inventory of the items in offices of employees on administrative leave. Nor had the Hospital ever informed Dr. Ortega that his office could be entered and investigated.

Dr. O'Connor told Dr. Ortega of his intention to investigate his management practices—but not of any intent to search his office—and asked him to take an administrative leave. Instead of taking leave, however, Dr. Ortega, with the approval of Dr. O'Connor, took an unpaid vacation beginning July 31, 1981 and ending August 14, 1981. Dr. O'Connor told Dr. Ortega not to return to the Hospital during his vacation without written permission. After Dr. Ortega left the Hospital, Friday placed a new lock on the door to Dr. Ortega's private office, which the doctor had occupied for his seventeen years of employment at the Hospital. Friday kept the key under his control. Before this occurred, Dr. Ortega was the only Hospital official who had a key to that office, and the office had never been entered without his permission.

On Friday, August 14, Dr. O'Connor sent a letter to Dr. Ortega informing him that the investigation had not been completed and that he had been placed on administrative leave with pay commencing on Monday, August 17. Dr. Ortega was told not to return to the Hospital until the investigation was completed. Apparently, however, Dr. Ortega did not receive the letter until it was delivered to his house on August 17, for during the weekend of August 15–16, Dr. Ortega returned to the Hospital to get his mail and discovered that the lock on his office door had been changed. Unable to enter the office, he took the new computer, which was

located in a nearby unlocked room, home for the weekend to do some work (something he often did). On Monday, August 17, Dr. Ortega called his secretary to ask whether he had any appointments and informed her that he had taken the computer home. Yet when Dr. O'Connor learned from others that the computer had been taken, he claims to have believed that a theft of state property had occurred; in any event, he filed a report with Hospital police. The police report, dated that same day, states that Dr. Ortega had informed his secretary that he had taken the computer home.

During the ongoing investigation of Dr. Ortega—possibly as early as in the first two weeks of August—Dr. Margaret Pranger, a staff psychiatrist who ran a therapy support group for residents, including those in Dr. Ortega's program, told Dr. O'Connor in very vague and general terms of complaints made by a current and a former resident regarding Dr. Ortega's conduct toward them. After Dr. Pranger spoke with Dr. O'Connor, he asked her to talk with Dr. Thomas Laskay, the head of the investigative team, and she repeated the same vague and general statements to him. Although neither woman had used the phrase in talking with Dr. Pranger, at a later time in the proceedings, she characterized their comments as relating to sexual harassment.

Sometime around the time Dr. Ortega took the computer home—but certainly well before the last week of August—the Hospital's investigators commenced a series of searches of Dr. Ortega's office without a warrant and without his knowledge or consent. It is unclear whether Dr. Ortega's taking the computer home or Dr. Pranger's reporting of her concerns predated the inception of the searches. In any event, at some point in August, Friday and the investigators began their searches and seizures of Dr. Ortega's property. (For convenience, hereafter, we refer to the series of searches as simply "the search.") Friday later claimed "the search was initiated because he 'wanted to make sure that we had our state property identified, and in order to provide Dr. Ortega with his property and get what we had out of there, in order to make sure our resident's

files were protected, and that sort of stuff.'" *O'Connor v. Ortega*, 480 U.S. 709, 727, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion) (quoting Friday's deposition). Dr. O'Connor similarly claimed that the search was initiated "for the purposes of trying to look at the issues around obtaining the computer and the contracts and where documents might be placed, if in fact they [were] State documents on State property," or, in other words, "to make a determination as to what is State and what is not the State's." O'Connor deposition at 60, 73. The search was completed sometime before August 27.

The search was extremely thorough and highly intrusive. The investigative team entered Dr. Ortega's office on several occasions and repeatedly searched his office, his desk, and his private file cabinets. In his desk drawers, the investigators examined and, according to Dr. Laskay's report, read "numerous personal letters from friends, one of his ex-wives, a daughter, as well as many sexually explicit letters from several women over the years." The investigators removed the checks and correspondence regarding Dr. Ortega's acquisition of the computer. They then reviewed and boxed up the remaining state property along with Dr. Ortega's personal possessions—lecture notes and numerous teaching aids, framed artwork, photographs from students, letters from family members, copies of published and unpublished articles, rejection letters from medical journals, a manuscript for a new book, desk accessories, and confidential medical files of patients not connected with the Hospital—and placed everything in a special locked storage area to which Dr. Ortega did not have access. At no time did anyone ever inventory any of the state's items from the office; nor did anyone ever separate the state's property from Dr. Ortega's personal property. Everything was simply boxed up and kept together in the state's possession for a lengthy period.

During the course of the search, Friday conducted an exploration of his own one evening, without the other investigators. He found and removed from Dr. Ortega's desk drawer a suggestive photo, a Valentine, and a book of love poetry (with a short inscription) given to Dr. Ortega about ten years earlier by a former resident, Dr. Joyce Sutton. Friday recognized Dr. Sutton as a medical school classmate of Dr. O'Connor's. Friday took these items, which became known as the "Sutton materials," and promptly showed them to Dr. O'Connor. No one had then, or has ever since, alleged that Dr. Ortega sexually harassed, or behaved improperly toward, Dr. Sutton. The only "official" use to which these seized materials were ever put was to attempt to impeach Dr. Sutton when she testified on Dr. Ortega's behalf at a State Personnel Board hearing.

At the close of its investigation, the investigative team filed a report recommending that Dr. Ortega be fired. The Hospital fired him on September 22, 1981, and the State Personnel Board subsequently upheld the termination. During this whole ordeal, and even afterwards, Dr. Ortega's personal possessions remained in the control of the Hospital. Ms. Owen reported that she had asked Dr. Ortega on the phone sometime in October whether he wanted his personal possessions back, and that he had replied that he did not. In a letter dated October 30, 1981, however, California Deputy Attorney General Asher Rubin, counsel for the Hospital in the State Personnel Board hearing, informed Dr. Ortega he could inspect and make copies of his personal property, but that it would not be returned to him. In any event, Dr. Ortega eventually hired an attorney to get his possessions back in May, 1982.

Shortly thereafter, Dr. Ortega, filed a complaint under 42 U.S.C. § 1983 against Dr. O'Connor and Friday,[1] alleging that they had violated his Fourth Amendment right to be free from unreasonable search and seizure. Dr. Ortega claimed that the defendants' repeated intrusions constituted an unreasonable and indiscriminate search—essentially a fishing expedition—aimed at discovering whether there was any material of any kind in his possession that might be used against him at an administrative proceeding. The defendants denied these allegations and asserted that the search was simply part of the established Hospital procedure to inventory

---

1. Dr. Ortega initially named some other individuals as defendants as well, but those individuals, for one reason or another, have dropped out of the case in the course of the extended litigation.

property within the offices of departing, terminated, or separated employees. On cross-motions for summary judgment, the district court granted summary judgment for the defendants.

On appeal, we reversed and granted summary judgment in Dr. Ortega's favor on his § 1983 claim. We pointed out that as the Hospital had no policy of conducting inventories of the offices of employees on administrative leave, the search could not have been conducted pursuant to any established procedure. Thus, we concluded that, given the unwarranted intrusion, the defendants had violated Dr. Ortega's Fourth Amendment rights. *Ortega v. O'Connor,* 764 F.2d 703 (9th Cir.1985). Certiorari was granted. 474 U.S. 1018, 106 S.Ct. 565, 88 L.Ed.2d 551 (1985).

Before the Supreme Court, the defendants retreated from their position that an established policy justified their search and, instead, argued more generally that the search was "required to secure the state property in Dr. Ortega's office." *O'Connor v. Ortega,* 480 U.S. 709, 727, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion) (hereinafter *"O'Connor"*). In a four-one-four decision, the Court agreed unanimously with our holding that Dr. Ortega had a reasonable expectation of privacy in his office, desk, and file cabinets, but five Justices rejected our ruling that, even drawing all reasonable inferences in the defendants' favor, the search and seizure as a whole was unreasonable as a matter of law. *See id.* at 727–29, 107 S.Ct. 1492 (plurality opinion); *id.* at 732, 107 S.Ct. 1492 (Scalia, J., concurring in judgment). The Court stated that genuine issues of material fact remained regarding the purpose, justification, and scope of the search, declined to grant summary judgment for either party, and reversed and remanded to the district court for further proceedings.

In 1992, during a jury trial in which Dr. Ortega proceeded *pro se,* the district court granted a directed verdict for the defendants

at the close of evidence. Dr. Ortega re-hired his lawyer and appealed. We once again reversed the district court, holding that it had improperly excluded most of Ortega's witnesses as a sanction for failing to serve a witness list on opposing counsel. *Ortega v. O'Connor,* 50 F.3d 778 (9th Cir.1995). We remanded for a new trial.[2]

This time on remand,[3] the defendants retreated even from their general assertion that they invaded Dr. Ortega's office because of their need to secure state property, and argued still more generally that "the charged improprieties in [Dr.] Ortega's management as a supervisor of the Department of Professional Education," including the removal of the computer and Dr. Vaughan's complaint, justified the search. Defendants' Brief at 8, 20. The defendants also contended that their seizure of the Sutton materials was warranted by allegations of sexual misconduct. Dr. Ortega, on the other hand, continued to maintain that the defendants' alleged justifications were pretextual "cover-ups"— false post-hoc rationales for conducting a search that, in reality, was not tied to any particular allegation of wrongdoing or any expectation of finding any specific evidence. He persisted in his assertion that the search constituted an unrestrained and indiscriminate effort to discover any material that could be of use to the Hospital should it decide to initiate administrative proceedings against him on any basis. He also vigorously contested the defendants' assertion several years after the fact that they knew about, or were concerned about, any sexual harassment allegations when they began their search. Finally, Dr. Ortega argued that whatever the initial justification, the sweeping scope of both the search and the seizure, and the extended length of each, rendered them unreasonable.

During the pre-trial proceedings, the district court rejected the defendants' assertion of qualified immunity, which they offered, for

---

2. Although our first decision in this matter was issued by a panel which consisted in part of members of the present panel, our second decision was issued by three judges who did not participate in either the first appeal or this one. The second opinion was authored by Judge O'Scannlain.

3. Judge John P. Vucasin, Jr. presided over the proceedings prior to the second remand. Following his death, the case was assigned to now-Chief Judge Marilyn Hall Patel, who presided over the second trial, which resulted in the judgment now on appeal.

the first time following remand, on the eve of trial.[4] The judge did, however, ultimately give the jurors instructions that accurately set forth all of the legal principles applicable to the defendant's qualified immunity defense, although it did not label the instructions accordingly. During the pre-trial hearing, the district court also ruled that the evidence of "sexual harassment" could not reasonably have supported the search, or any part of it, that the seizure of the Sutton materials violated Dr. Ortega's Fourth Amendment rights as a matter of law, and that evidence regarding Dr. Ortega's sexual conduct would not be admitted at the liability phase of the bifurcated trial.[5] The court then conducted a jury trial, first on liability and subsequently on damages. The jury found for Dr. Ortega in all respects. It decided that each defendant had violated his constitutional rights by conducting an unconstitutional search and an unconstitutional seizure, and it awarded Dr. Ortega $376,000 against both defendants in compensatory damages, and $25,000 against Dr. O'Connor and $35,000 against Mr. Friday in punitive damages.

The defendants appeal. While they raise several issues, only two merit our close consideration: (1) whether the defendants were erroneously deprived of their qualified immunity defense; and (2) whether the district court erred in ruling as a matter of law that the seizure of the Sutton materials was unreasonable, and that the allegations of sexual misconduct were inadmissible during the liability phase. We now turn to those two issues.

## II

■■■ To defeat a claim of qualified immunity, the plaintiff must show that "the law was clearly established" at the time of the violation of the plaintiff's statutory or constitutional right, such that "a reasonably competent public official should [have known he was violating] the law governing his conduct." *Harlow v. Fitzgerald,* 457 U.S. 800, 818–819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[6] "Determining whether a public official is entitled to qualified immunity 'requires a two-part inquiry: (1) Was the law governing the state official's conduct clearly established? (2) Under that law could a reasonable state official believe the conduct lawful?'" *Liston v. County of Riverside,* 120 F.3d 965, 975 (9th Cir.1997) (quoting *Act Up!/Portland v. Bagley,* 988 F.2d 868, 871–72 (9th Cir.1993)). Courts should decide issues of qualified immunity as early in the proceedings as possible, but when the answer depends on genuinely disputed issues of material fact, the court must submit the fact-related issues to the jury. *See Liston,* 120 F.3d at 975; *Act Up!/Portland,* 988 F.2d at 873.

In the district court, following the second remand, the defendants moved for summary judgment on the merits without raising qualified immunity,[7] but later argued in their "trial brief" that they were entitled to such immunity.[8] The defendants argued in two

---

4. At the earlier, second district court proceeding, Judge Vucasin had rejected this defense, as contained in a summary judgment motion, on the ground that the relevant law was "clearly established."

5. In view of these rulings, the district court, at the defendants' request, also excluded from the liability phase any information regarding the Sutton materials, including the fact that they had been seized.

6. The plaintiff in a § 1983 case also must show that the defendants acted under color of law. *See* 42 U.S.C. § 1983. The defendants, however, never have asserted that they were not acting under color of law. Rather, they emphasize that they were "carrying out their duties in the public trust in authorizing a search for evidence of Dr. Ortega's misconduct." Defendant's Brief at 23.

7. We reject as without merit the defendants' argument on appeal that the district court erred

in denying their summary judgment motion. The Supreme Court expressly declined to grant summary judgment in their favor in *O'Connor,* stating that "the record [at that stage] was inadequate for a determination on motion for summary judgment of the reasonableness of the search and seizure." *See* 480 U.S. at 727, 107 S.Ct. 1492 (plurality opinion). No factual disputes were clarified or resolved in the defendants' favor between the Court's ruling and the time at which they renewed their motion for summary judgment on the most recent remand.

8. Given that the defendants did not assert that they were entitled to summary judgment on the basis of qualified immunity, it is somewhat unclear whether they were asserting in their trial brief that they were entitled to judgment as a matter of law on that basis or whether they were merely requesting that the issue be litigated at trial. At the pretrial hearing, the district court apparently made the logical assumption that the

perfunctory sentences that they could reasonably have believed that they could search Dr. Ortega's office because prior to the Supreme Court's opinion in this case, the law governing office searches was not clearly established.[9] Dr. Ortega, on the other hand, asserted that under the facts that he would establish at trial—i.e., that no inventory of state property was ever needed or made, although that was the excuse repeatedly offered for the defendants' actions, and that the true purpose of the search was to rummage through the office in the hopes of discovering some unspecified evidence of any kind that might serve as the basis for charges that could be brought against him—the unreasonableness of both the search's inception and scope would have been apparent to any reasonable public official. He also argued that the seizure was unreasonable for the same reasons—as well as because of the inordinate length of the retention of his personal and professional materials—and that the unreasonableness of this conduct would have been evident to any reasonable person. If Dr. Ortega's version of the facts was true, the defendants clearly were not entitled to qualified immunity, but had the defendants' version been accurate, they might have been, at least in part.

■ Although the district court declared that it would not instruct the jury on qualified immunity, the plaintiff and the defendants jointly proposed to the district court, and the court accepted, a jury instruction that applied a "reasonableness" test not, as the district court had suggested, to the search itself, but instead to the defendants' beliefs regarding the search. More important, that instruction stated that the reasonableness inquiry as to public officials' beliefs is determined under an objective standard— whether a *reasonable officer would have believed* he had a reasonable basis for the search. The instruction, as it was read to the jury, provided as follows:

· [The Defendants] contend that any actions they took relative to the search of the Plaintiff's office were justified by their reasonable belief that these actions were permitted or required and, therefore, were lawful.

. . . .

If a Defendant reasonably believed that a search or seizure was lawful, and acted on the basis of that belief, then his reasonable belief would constitute a complete defense to the Plaintiff's claim even though, in fact, the search or seizure was not lawful. Put another way, even if you find that a Defendant violated Plaintiff's constitutional rights by an unlawful search or seizure the Defendant cannot be liable if he reasonably believed at the time he acted that his actions were in accordance with the law.

But keep in mind that this reasonableness inquiry is an objective one. [The question is whether a] reasonable officer under those same circumstances would believe that he had a basis, a reasonable basis for searching consistent again with these instructions.

After reading this instruction, the district judge told the attorneys that she did "not consider [this instruction to] constitute[ ] a qualified immunity defense" because it recited "essentially the flip side of the Plaintiff's burden of proof" in a § 1983 case based on a Fourth Amendment claim.

The instruction, in fact, provided a classic qualified immunity instruction. An unlawful search and seizure is not rendered permissible under the Fourth Amendment—in a § 1983 context or otherwise—when the state officials could "reasonably" have believed that their search was "reasonable." Rather, the Fourth Amendment, *absent the issue of qualified immunity*, prohibits all searches that are objectively "unreasonable," *regard-*

defendants were requesting the latter, and they said nothing to contradict that understanding. The district judge also noted that even if the defendants had requested summary judgment based on qualified immunity, "I would have denied it in any event."

9. The Supreme Court in *O'Connor* had expressly declined to address the issue of qualified immu-

nity in this case. 480 U.S. at 729 n. *, 107 S.Ct. 1492 (plurality opinion). On the first remand to the district court, Judge Vucasin denied the defendants' motion for summary judgment on the basis of qualified immunity, but we reversed the outcome of that proceeding on other grounds and remanded once again.

less of whether the officials could reasonably have believed the search was reasonable. *Hammer v. Gross,* 932 F.2d 842, 849–50 (9th Cir.1991) (en banc). And violations of this standard, absent the issue of qualified immunity, may provide the legal basis for damages in § 1983 suits. Here, the district court's "extra" reasonableness test, which the parties both requested in the jointly proposed jury instructions, constituted an appropriate and proper instruction to the jury on the second prong of the defendants' qualified immunity defense—whether a reasonable state official could have believed his conduct was lawful—the prong as to which the existence of factual disputes requires the jury's determination. *Id.* at 850; *see also Ram v. Rubin,* 118 F.3d at 1306, 1310 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 686, 139 L.Ed.2d 633 (1998); *Act Up!/Portland,* 988 F.2d at 868; Fifth Circuit Pattern Jury Instructions (Civil) § 10.1 (West 1997). In the end, there was simply no error as to the second prong of the instruction—the part relating to a reasonable officials' belief that the actions were consistent with established law.[10]

The instructions also set forth the substantive Fourth Amendment law, as required by the first prong of the qualified immunity standard. Accordingly, the only actual question on appeal as to the qualified immunity issue is whether the substantive law that the court set forth in the jury instructions was correct and whether is was clearly established in 1981. If it was, then there was no error at all in the "qualified immunity" instructions, despite the fact that the district court did not identify them as pertaining to that particular defense. The court instructed the jury that:

> The Fourth Amendment to the Constitution, again, protects the rights of people to be secure in their persons, houses, paper

effects against unreasonable searches and seizure.

> . . . .

> . . . You are instructed as a matter of law that Plaintiff has a reasonable—Plaintiff, meaning Dr. Ortega in this case, had a reasonable expectation of privacy in his office, including his desk and file cabinets.

> Determining the reasonableness of any search involves a two-fold inquiry. First, one must consider was the action justified at its inception? Second, one must determine whether the search actually conducted was reasonably related in scope to the circumstances which justify the search in the first place.

> The search of a private office will be permissible in scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the nature of the misconduct.

> If you find that the search of the Plaintiff's office was not motivated by a legitimate work-related need, but was merely an investigatory search to discover evidence that could be used against the Plaintiff, you may consider that as evidence that the search was unreasonable.

> . . . .

> A warrantless search of an employee's office is work-related, and lawful, if it is carried out for a work-related purpose; either to retrieve the employer's property or as part of an investigation of work-related misconduct of the employee whose office is searched.

■ The defendants' do not challenge the accuracy of the district court's statement of the law. Instead, their entire qualified immunity argument (other than reciting the basic doctrine) is that "[u]ntil the Supreme Court announced its opinion in 1987 in this

---

10. To the extent that there was any variation in the instruction resulting from the substitution of the word "would" for "could," that variation was, in this particular context, not significant. *See United States v. Beltran–Rios,* 878 F.2d 1208, 1214 (9th Cir.1989) (holding that "[t]he trial judge has substantial latitude in tailoring the instructions" so long as they are not misleading or inadequate to guide the jury's deliberations). Moreover, the instruction could have been inter-

preted by the jury to afford the defendants an even more favorable qualified immunity instruction than the law allows. While, in qualified immunity cases, "the burden is on the defendant to establish the reasonableness of his or her actions," *Pierce v. Multnomah County,* 76 F.3d 1032, 1038 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 506, 136 L.Ed.2d 397 (1996), the district court never instructed the jury that the defendants had to carry the burden on this issue.

case, it could hardly be said that the law governing workplace office searches was 'clearly established.'" Defendants' Brief at 26. Dr. Ortega, on the other hand, contends that the law in 1981 *was* clearly established as to both of the basic principles expounded by the district court: (1) that government employees had a reasonable expectation of privacy in private offices; (2) that administrators could search private offices and seize their contents only to the extent that those actions were reasonably related to work-related justifications.[11] We agree with Dr. Ortega.

The Supreme Court has explained that a right is clearly established if

the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, [citations omitted]; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see also Act Up!/Portland*, 988 F.2d at 873. To determine whether a right is clearly established, we look to Supreme Court precedent and then to lower court decisions with an eye toward whether the Supreme Court would adopt their analysis. *Kirkpatrick v. City of Los Angeles*, 803 F.2d 485, 490 (9th Cir.1986).

First, it was clearly established in 1981 that, in the absence of an accepted practice or regulation to the contrary, government employees such as Dr. Ortega had a reasonable expectation of privacy in their private offices, desks, and file cabinets, thereby triggering the protections of the Fourth Amendment with regard to searches and seizures. As early as the mid-60's the Supreme Court considered it settled law that the Fourth Amendment protects a person's property when he places it in "his office," and that when "he puts something in his filing cabinet [or] in his desk drawer, ... he has the right to know it will be secure from an unreasonable search or an unreasonable seizure." *Hoffa v. United States*, 385 U.S. 293, 301, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). The Court, of course, memorialized the principle that this rule applies with equal force to government employees in the *O'Connor* case, but earlier holdings by the circuit courts had made the point clear well before 1981. Indeed, the *O'Connor* plurality itself cited three pre–1981 on-point circuit court holdings for the proposition that Dr. Ortega "had a reasonable expectation of privacy at least in his desk and file cabinets." *See* 480 U.S. at 719, 107 S.Ct. 1492 (plurality opinion) (citing *Gillard v. Schmidt*, 579 F.2d 825, 829 (3rd Cir. 1978); *United States v. Speights*, 557 F.2d 362 (3rd Cir.1977); *United States v. Blok*, 188 F.2d 1019 (D.C.Cir.1951)); *see also United States v. Nasser*, 476 F.2d 1111, 1123 (7th Cir.1973) (holding that government employee had a right to privacy in his private office). No circuit as of 1981 had held to the contrary. *See Kirkpatrick*, 803 F.2d at 490 (stating that when the Supreme Court would adopt lower courts' decisions, a right is more clearly established).

Next, it was clearly established in 1981 that warrantless searches and seizures subject to the Fourth Amendment had to comport at least with the Amendment's long

---

11. While one might argue that the instruction stating that a search could be unreasonable if it was "merely an investigatory search to discover evidence that could be used against Plaintiff" might be viewed as saying that investigatory searches are generally unreasonable, the instruction that followed it clearly explained that "[a] warrantless search of an employee's office is work-related, and lawful, if it is ... part of an investigation of work-related misconduct of the employee whose office is searched." What the court was seeking to explain was simply that an unfounded fishing expedition is not authorized, that the search must be "reasonably related" to legitimate objectives. Thus, we think that the instructions "taken as a whole" conveyed the message that a search is reasonable to the extent that it is reasonably related to work-related justifications and that this rule applies to investigatory searches as well. *See United States v. Kessi*, 868 F.2d 1097, 1101 (9th Cir.1989) (holding that we look to whether the instructions "taken as a whole were misleading or represented a statement inadequate to guide the jury's deliberations"); *United States v. Robinson*, 546 F.2d 309, 314 (9th Cir.1976) (holding that court should review instruction describing constitutional inquiry to determine whether "the charge, taken as a whole, fairly and accurately conveys the meaning" of the inquiry). In any event, the defendants do not contend that the instructions state the law incorrectly.

established minimum requirement that they be "reasonable under the circumstances." This requirement was first elucidated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and nothing in the *O'Connor* opinions or any intervening case modified its applicability to workplace searches.[12] We therefore reject the defendants' suggestion that the law providing that workplace searches must be reasonable under the circumstances became clearly established only upon the issuance of the Supreme Court's opinion and not before. If the Court had established a "new rule" of constitutional law, this might be the case. But in *O'Connor*, the Supreme Court, in discussing each of the applicable legal rules explicitly *declined to expand* individuals' Fourth Amendment rights. The Court first rejected the contention that government employers should be required to get warrants or satisfy a "probable cause" standard before they search their employees' offices. *See* 480 U.S. at 720–26, 107 S.Ct. 1492 (plurality opinion); *id.* at 732–33, 107 S.Ct. 1492 (Blackmun, J., dissenting) (arguing that the Court should have adopted warrant requirement in investigatory workplace searches). Second, the Court reiterated the pre–1981 rule that a search of a protected area does not violate the Fourth Amendment if the actual search is reasonable under all the circumstances. *See id.* at 719, 727–29, 107 S.Ct. 1492 (plurality opinion). In explaining the basis for the latter holding, the Court simply recited the *Terry* general "reasonableness" standard for analyzing Fourth Amendment violations—namely, whether the search was justified at its inception and whether the search itself was reasonably related in scope to the circumstances that justified it. *Terry*, 392 U.S. at 20, 88 S.Ct. 1868, *cited in O'Connor*, 480 U.S. at 726, 107 S.Ct. 1492 (plurality opinion).

Circuit courts had applied this general "reasonableness" principle to workplace searches several times before 1981, consistently concluding that a warrantless search by an employer or supervisor of an employee's private office, desk or file cabinets was reasonable under the Fourth Amendment only to the extent that it was "work related." *See O'Connor*, 480 U.S. at 720–21, 107 S.Ct. 1492 (plurality opinion) (stating that pre–1981 circuit cases held that a workplace search of an employee's private office must be at least "work related"); *Gillard*, 579 F.2d at 829 & n. 1 (holding that supervisor's search of a public school guidance counselor's desk for personal cartoon violated Fourth Amendment because supervisor "was [not] acting to recover government property"); *Nasser*, 476 F.2d at 1123 ("We believe this element of work-relatedness is where" the line of reasonableness "must be drawn"); *United States v. Collins*, 349 F.2d 863, 867–68 (2d Cir.1965) (holding that the government, as an "employer," had the right to search an employee's jacket for stolen customs mail "to investigat[e] a crime connected with the performance of defendant's duties as a Customs employee" and distinguishing searches "unconnected with the performance of the [employee's] duties"); *Blok*, 188 F.2d at 1021 (holding that "[i]n the absence of a valid regulation to the contrary, ... [an employee's] superiors could not reasonably search [her] desk for her purse, her personal letters, or anything else that did not belong to the government" or relate to her work); *cf. Mancusi v. DeForte*, 392 U.S. 364, 369, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) (suggesting that a superior might be able to enter the private office of the employee of a union in order to retrieve "union records"). Neither this court, nor any other court had, as of 1981, ever suggested that a general or indiscriminate workplace search, or a work-

---

**12.** The *Terry* rule was adopted with specific reference to police officers' "stops" of persons suspected of crimes, but the Supreme Court has explained that the rule has long been thought to embody essentially the "irreducible" minimum required for *all* warrantless searches covered by the Fourth Amendment. *See New Jersey v. T.L.O.*, 469 U.S. 325, 340–41, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (citing an array of cases rejecting a higher standard than *Terry*'s "reasonableness" test but accepting *Terry* as setting the

minimum standard). Courts understood *Terry*'s minimum standard to apply to all Fourth Amendment searches and seizures well before 1981. *See, e.g., Katz v. United States*, 389 U.S. 347, 358–59, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (stating that protection against searches unreasonable in "scope" applies to searches of "an office"); *United States v. Most*, 789 F.2d 1411, 1415 (9th Cir.1986) (citing several pre–1981 lower court cases reciting in various contexts essentially the *Terry* standard).

place search *not* reasonably related to work itself or to specific work related misconduct, would be constitutional, unless the individual had consented to such a search as a condition of employment. *See United States v. Bunkers,* 521 F.2d 1217, 1220 (9th Cir.1975) (upholding search of postal employee's locker because well publicized regulations informed employees that lockers were subject to search to combat pilferage and stealing).[13]

In sum, in light of the clearly established law in 1981 and the parties' factual disputes regarding the justification for the search and the intended and actual scope of the search and seizure, the defendants were entitled to an instruction that told the jury two things: (1) that the law provided that they were entitled to search Dr. Ortega's office for work-related reasons, or to look for evidence of specific work-related misconduct, subject essentially to *Terry's* minimum requirement that the search and seizure be "reasonable" in both its inception and scope; and (2) that if, given the facts as proved at trial, reasonable officials in the defendants' position could have believed that their conduct was in conformity with that law, the defendants could not be held liable. *See, e.g., Act Up!/Portland,* 988 F.2d at 873. That is exactly what the district judge told the jury in the instructions she gave.

Furthermore, because the jury found in Dr. Ortega's favor, we must assume that it accepted his version of the facts, which was supported by substantial evidence—i.e., (1) that the defendants, under the pretense of conducting an "inventory" of state property in order to separate personal from official materials, conducted instead a purely indiscriminate fishing expedition through his most personal belongings in hopes of discovering some evidence that might be useful at an

adversary administrative hearing; (2) that the repeated intrusions and examinations of Dr. Ortega's private possessions, including his purely personal belongings, clearly exceeded the scope of a reasonable work-related search; (3) that the defendants retained *all* of the property that had been in his office, both personal and official, in one undivided mass; and (4) that when their first explanation was exposed as false, the defendants then offered other equally untruthful rationales for their conduct. A reasonable official in the defendants' position could not have believed that a search and seizure conducted under the circumstances and in the manner described by Dr. Ortega was reasonably work related or otherwise consistent with established law. The defendants, therefore, could not have prevailed on their qualified immunity defense under any set of lawful qualified immunity instructions. *See, e.g., Chuman v. Wright,* 76 F.3d 292, 294 (9th Cir.1996) (holding that in civil cases, we will not reverse the judgment on account of an erroneous jury instruction when "the error is more probably than not harmless"); *Benigni v. City of Hemet,* 879 F.2d 473, 480 (9th Cir.1988) (declining to reverse § 1983 verdict on the ground that "any error in the qualified immunity instruction was harmless" because "the evidence would have supported a verdict for the plaintiff even with [the addition to the] instruction" that the defendants claimed was needed).

### III

■ In a motion *in limine* prior to trial (while the defendants' motion for summary judgment was under submission), Dr. Ortega argued that any evidence of sexual harassment as an alleged justification for the

---

13. Contrary to the defendants' suggestion, the Seventh Circuit's decision in *Shields v. Burge,* 874 F.2d 1201 (7th Cir.1989), does not hold that the law on this point was unsettled prior to *O'Connor.* In *Shields,* the court upheld on qualified immunity grounds a search conducted by a police officer's supervisors who had undisputed evidence of work-related misconduct and had reason to believe that other evidence of that misconduct might be found in the officer's desk. *Id.* at 1204. The court held that it was not clearly established in 1985 that the Fourth Amendment prohibited warrantless "work-related intrusions by superiors" or "investigation[s]

into work-related misconduct" simply because the evidence of the serious criminal misconduct was "thin." *Id.* 1205–06. The court concluded that the defendants were entitled to qualified immunity because they reasonably could have believed that they could conduct a search of the officer's office desk drawer "aimed solely at discovering evidence that he had violated State Police rules." *Id.* at 1206. The undeniable implication of this holding is that if the justification or purpose of the search had not been reasonably work-related, the defendants would not have been insulated from liability by qualified immunity.

search should be excluded under Federal Rule of Evidence 403 because when the defendants began searching his office, they neither had knowledge of nor were motivated by any sexual harassment allegations. Moreover, Dr. Ortega contended, even if the defendants did have such knowledge, the allegations were so flimsy and insubstantial that the probative value of such evidence with respect to the reasonableness of the search was substantially outweighed by its unfair prejudice to him. The district court informed the parties that it would hold a hearing on the issue and allowed them additional time to prepare arguments on the further question whether it would also be appropriate to rule as a matter of law that the seizure of the "Sutton materials"—the photograph, valentine, and inscribed book of poetry—was unreasonable. Several days later, at the conclusion of the evidentiary hearing, the district court "rule[d] as a matter of law" that the search and seizure of the Sutton materials violated the Fourth Amendment because, even viewing all of the evidence in the light most favorable to the defendants and resolving all disputes of fact in their favor, a search for the purpose of investigating charges of improper conduct toward female resident physicians could not be justified, and thus the seizure was unlawful.[14] The court also held that the evidence of "sexual harassment" would be excluded from the liability phase of the trial.

The defendants argue that the district court violated established rules of procedure by effect granting *sua sponte* partial summary judgment against them.[15] Moreover, they contend that, in doing so, it erroneously analyzed their asserted justifications for the search in a piecemeal fashion and erroneously required the "harassment" justification to satisfy a "probable cause" standard, instead of merely a "reasonableness" standard. Although the district court did not characterize its decision under any specific procedural

rubric, the transcript of its oral decision makes clear that it did in fact grant partial summary judgment in favor of Dr. Ortega. However, because the defendants "had an adequate opportunity to address the issues involved, including adequate time to develop any facts necessary to oppose summary judgment," the district court was procedurally free to do so. *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1533 (9th Cir.1995); accord *United States v. Real Property Located At 25445 Via Dona Christa*, 138 F.3d 403, 407 n. 4 (9th Cir.1998); *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311–12 (9th Cir.1982). Thus, the real issues we must consider are (A) whether the district court was substantively correct that partial summary judgment was warranted and (B) whether it abused its discretion in excluding the evidence of sexual harassment. We address each question in turn.

### A

We think it important initially to emphasize that, as is implicit in the district court's holding, the defendants' search and seizure of the Sutton materials could be lawful, *if at all*, only pursuant to a search reasonably justified by allegations of sexual misconduct. Equally important, the type of search at issue here involves an invasive examination by the government of the most private and historically protected materials, and its reasonableness must be evaluated in light of that factor. Well before the defendants ever seized the Sutton items from Dr. Ortega's office, it was beyond dispute that, as Chief Justice Burger explained:

> [T]ruly private papers or communications, such as a personal diary or family correspondence, ... lie at the core of First and Fourth Amendment interests.
>
> ... The papers in [these areas] are of the most private nature, enjoying the highest status under our law. Mr. Justice Brennan recently put it this way: "Person-

---

**14.** It is important to note that the district court did *not* suggest that the seizure of the Sutton materials would have been proper even if a search for evidence relevant to sexual harassment *could* lawfully have been conducted, and we make no such suggestion here.

**15.** The defendants specifically use the term "directed verdict," but, since the district court's

ruling was issued prior to trial, it is properly viewed as a grant of summary judgment. In any event, as the defendants point out, the standard for granting a directed verdict is essentially the same as that for summary judgment. *See Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989).

al letters constitute an integral aspect of a person's private enclave." *Fisher v. United States*, 425 U.S. 391, 427, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) (concurring in judgment). An individual's papers, he said, are "an extension of his person." *Id.* at 420, 96 S.Ct. 1569. Mr. Justice Marshall made the same point: "Diaries and personal letters that record only their author's personal thoughts lie at the heart of our sense of privacy." *Couch v. United States*, 409 U.S. 322, 350, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973) (dissenting opinion). . . .

One point emerges clearly: [Such papers] involve the most fundamental First and Fourth Amendment interests. . . . Indeed, where papers or books are the subject of a government intrusion, our cases uniformly hold that the Fourth Amendment prohibition against a general search [forbids an] "indiscriminate sweep . . ." [of such articles]. *Stanford v. Texas*, 379 U.S. 476, 486, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

*Nixon v. Administrator of General Servs.*, 433 U.S. 425, 529–31 & n. 27, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (Burger, C.J., dissenting) (internal footnote and citations omitted).[16]

Despite the validity of the principles set forth by Chief Justice Burger, we need not decide whether the *scope* of the defendants' examination of Dr. Ortega's private correspondence was unreasonable. The Sutton materials in no way relate to the computer acquisition or to Dr. Vaughan's complaints. Nor are the materials evidence in themselves of work-related misconduct or other crimes in the way fraudulent invoices or dangerous weapons might be. Accordingly, if the allegations of Dr. Ortega's improper conduct toward female residents did not justify the search of his desk for evidence relevant to that charge, or if it was otherwise unreasonable to search the desk for the purpose of obtaining evidence of sexual harassment, then the defendants had no right to examine the Sutton materials and other similar personal, private correspondence at all.

Viewing the facts—especially the timing of events—in the light most favorable to Drs. O'Connor and Laskay and resolving all issues of disputed fact in their favor, at the time the defendants searched Dr. Ortega's office and seized the Sutton materials, they knew of only two possible incidents of sexual misconduct that might have occurred in Dr. Ortega's seventeen years of service at the Hospital—one of which was extremely vague and general and the other unquestionably stale. Dr. Pranger, a psychiatrist who met with residents once a week in a "support group," told Drs. O'Connor and Laskay in the most general terms that one current resident and one former resident—both of whose names she declined to reveal, apparently for confidentiality reasons—had complained to her that Dr. Ortega had engaged in improper behavior toward them. Dr. Pranger did not use the term "sexual harassment," but explained several years later that the allegations would, at that later date, be classified as such. Dr. Pranger did not describe to either doctor the details of the alleged conduct, and she testified at the evidentiary hearing only that a current resident had told her generally that Dr. Ortega's behavior made her unhappy with her residency and that "on [a] Saturday morning Dr. Ortega had shown up at her house." Dr. Pranger also testified at that hearing that a former resident told her that during her residency in the early 1970's (about ten years before the search), Dr. Ortega had "stroked her hair," said "that she was very special and had to leave her husband," and engaged in other similar conduct. The former resident not only told Dr. Pranger about the ten-year old occurrence but spoke with Dr. O'Connor about it. Finally, when Dr. Laskay asked Dr. Ortega about allegations of sexual harassment, Dr. Ortega expressly denied the charges and then laughed and said, "Why should I? They harass me."[17]

---

**16.** Although the above quotation was contained in a dissent, there was no disagreement between the members of the majority and the dissenters on this point. *See* 433 U.S. at 531, 97 S.Ct. 2777 (Burger, C.J., dissenting) (stating that the majority also "recogniz[es]" that the articles at issue constitute the "most private kinds of communica-

tions"). Chief Justice Burger was simply summarizing the Court's relevant holdings.

**17.** The defendants also claim that Dr. Laskay's "preliminary report" of August 27, 1981, to the Hospital "confirmed the existence of numerous, more recent complaints by residents supervised

As explained earlier, the Supreme Court in *O'Connor* unanimously reaffirmed that a government employee such as Dr. Ortega with a private office has a "reasonable expectation of privacy in at least his desk and his file cabinets." 480 U.S. at 718–19, 107 S.Ct. 1492 (plurality opinion); see also *id.* at 729, 107 S.Ct. 1492 (Scalia, J., concurring); *id.* at 741, 107 S.Ct. 1492 (Blackmun, J., dissenting). Thus, the question is whether the search for evidence of sexual harassment was reasonable under the all of the circumstances, assuming arguendo that such was the purpose of the search. This issue turns on the two-part *Terry* inquiry described above: "first, 'whether the ... action was justified at its inception; second, ... whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.' " ·*Id.* at 726, 107 S.Ct. 1492 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. 1868). In the context of a seizure of work-related items, the Court has explained:

> a search of an employee's office by a supervisor will be justified at its inception where there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a needed file.... The search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of ... nature of the [misconduct].

*Id.* (internal quotations and citations omitted). Thus, while the Court in *O'Connor* had "no occasion ... to reach the issue of the appropriate standard for the evaluation of the Fourth Amendment reasonableness of the seizure of Dr. Ortega's *personal* items,"

*id.* at 729 n. *, 107 S.Ct. 1492 (emphasis added), we can safely infer that in order to justify initiating a search for, and later seizing, those items in connection with any concern over sexual misconduct, the defendants needed *at a minimum* to have had "reasonable grounds for suspecting" (1) that Dr. Ortega had engaged in sexual harassment and (2) that a search of his office would turn up evidence supporting that suspicion. *See Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1336 (9th Cir.1987).

The defendants lacked such grounds. First, two complaints of improper conduct by Dr. Ortega over a seventeen-year period did not warrant a reasonable suspicion that the doctor was sexually harassing residents. The stronger of the two complaints was ten years old, rendering that evidence "stale" by any standard. It was also wholly uncorroborated. The more current complaint—the one that alleged specifically only that Dr. Ortega had appeared at an unidentified resident's home on a Saturday morning—was far too vague and unsubstantiated to serve as a basis for reasonable suspicion warranting any search of an employee's private office, let alone so intrusive a search and seizure of his most personal possessions.[18] "Reasonableness" must be viewed in the context of the nature of the intrusion involved.

We need not rest our decision solely on this ground, however, for even if the evidence were sufficient to warrant reasonable suspicion necessary for such a search, the defendants had *no* grounds to suspect that any evidence of sexual harassment would be found in Dr. Ortega's office. Indeed, Dr. O'Connor testified expressly that he had no reason to suspect that any such "specific" evidence might be found there, and that he did not tell the investigators to look for any-

by Dr. Ortega," Defendants' Brief at 15, but that is contrary to the information in the report. Rather, the statement regarding "additional and more recent cases of sexual harassment" is in an "addendum" dated August 28, 1981. The "addendum" states that it contains new information obtained after the preparation of the "preliminary report." Because the report of August 27 fully recounted the completed search of Dr. Ortega's office, the defendant's knowledge of the new allegations recited in the memorandum the next day unquestionably postdates the search, and,

even if admissible for other reasons, could not possibly justify it.

**18.** We note that we seriously doubt that the seizure of the Sutton materials would be reasonable in any event. The materials consisted of a picture, a valentine and a book of poetry given to Dr. Ortega by a former resident. The receipt of such gifts by him would not appear to constitute evidence that he engaged in any act of sexual harassment.

thing in particular. Moreover, neither of the alleged incidents involved the sending of any letters by (or even to) Dr. Ortega or in any way involved any type of physical evidence that might be found amongst his private possessions. The search was, at best, a general and unbounded pursuit of anything that might tend to indicate any sort of malfeasance—a search that is almost by definition, unreasonable. *See Stanford,* 379 U.S. at 486, 85 S.Ct. 506 (holding that the "history" and the "meaning" of the Fourth Amendment mandate that a warrant allowing an "indiscriminate sweep" by the government through a person's "books, records, ... pictures, recordings, and other written instruments ... is constitutionally intolerable") (internal quotation omitted).

Indeed, the indiscriminate search conducted by the defendants stands in stark contrast to all of the cases postdating *Terry* in which a supervisor's search of an area set aside for an employee's private use has been upheld—and even to some in which the search has been held unconstitutional. In each of those cases, the supervisor was searching for specific items and had at least a reasonable basis for believing that they would be found in the particular place they searched. *See Gillard,* 579 F.2d at 826–29 (search of guidance counselor's desk for a non-work-related unflattering cartoon held unconstitutional); *Speights,* 557 F.2d at 363–65 (search of police officer's locker for sawed-off shotgun held unconstitutional); *Bunkers,* 521 F.2d at 1218–20 (search of postal employee's locker for particular stolen package upheld because of regulations policy allowing such searches); *Collins,* 349 F.2d at 867–68 (pre-*Terry* case upholding search of customs employee's jacket for emeralds stolen from customs mail). The defendants, conversely, had no particular evidence, or even type of evidence, in mind when they allegedly searched Dr. Ortega's office for evidence of sexual harassment. Nor was there at the time of the search, or today, reason to believe that office Lotharios in general keep incriminating evidence of their activities in their desk drawers or files.

Although there is no doubt that allegations of sexual harassment in the workplace should be taken seriously, we reject the proposition that government employers are allowed to search their employees' private offices, invade "core [ ] First and Fourth Amendment interests," *Nixon,* 433 U.S. at 529 n. 27, 97 S.Ct. 2777 (Burger, J., dissenting), and seize their *purely personal* belongings on the basis of the type of charges involved here—one involving an occurrence that allegedly took place ten years earlier and the other at best a vague and non-specific, second-hand report regarding the general behavior of an employee toward an unidentified adult person. Nor, equally important, may such a search be conducted in the absence of specific reason to suspect that particular evidence of misconduct exists and will be found as a result of the search. *See O'Connor,* 480 U.S. at 726, 107 S.Ct. 1492 (plurality opinion). Indeed, given the privacy interests involved, it has long been apparent that stale and unsubstantiated allegations do not entitle supervisors to rummage through employees' desks and file cabinets without a reasonable belief that specific evidence of misconduct will be found, let alone scrutinize and seize whatever personal or romantic letters or mementos they may happen to locate. *See, e.g., Camara v. Municipal Court,* 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (holding that, in determining reasonableness of search, court must balance "the governmental interest which allegedly justifies the official intrusion" against the strength of the "constitutionally protected interests of the private citizen"); *Gillard,* 579 F.2d at 826–29 (holding that superior's search through personal items in employee's desk was unconstitutional even when a particular item was sought). Indeed, given that personal letters and mementos rest at the core of the right to privacy and "enjoy[ ] the highest status under our law," *Nixon,* 433 U.S. at 530, 97 S.Ct. 2777, we seriously question whether so egregious an invasion of privacy would ever be justified by bare, unsubstantiated allegations of sexual harassment that are expressly denied by the accused employee. There are far better and more productive ways of investigating such allegations without intruding unduly on constitutionally protected rights. A charge that a person has engaged in what may be offensive sexual conduct on one or more occasions does not make his or her entire personal and family existence fair game for indiscriminate and unrestrained governmental intrusion and examination. In any event, any search of

**1164**

private areas for evidence of such activities must at a minimum be based on a specific reason to suspect that particular evidence exists and that it will be found in the place to be searched; moreover, such a search must be carefully limited in scope, not only because of an historic respect for fundamental privacy but because of the need to insure that the search will not be "excessively intrusive." *O'Connor,* 480 U.S. at 726, 107 S.Ct. 1492 (plurality opinion); *accord Schowengerdt,* 823 F.2d at 1336.

The rule we apply in this case is not, contrary to the defendants' assertion, a probable cause rule; it simply reflects a proper definition of what constitutes an unreasonable intrusion under all the circumstances. Because no reasonable official in the defendants' position would have believed that a search based on the skeletal and stale allegations of Dr. Ortega's sexual misconduct was permissible under the Fourth Amendment or that any such search could be conducted in the absence of a reasonable suspicion that particular evidence would be discovered, the district court did not err in granting relief to Dr. Ortega on that issue by way of partial summary judgment.[19]

**B**

■ Given that the district court did not err in granting partial summary judgment regarding the Sutton materials, we have little difficulty in concluding that it did not err in excluding all evidence of sexual harassment

from the liability phase of the trial. The defendants' argument on this point is essentially the same as its challenge to the district court's partial summary judgment—i.e., that the allegations of sexual misconduct provided a sufficient justification for the ensuing search and seizure. However, because we have already ruled that the allegations of sexual harassment could not lawfully support the search that resulted in the seizure of the Sutton materials and because none of the seized items that remained at issue during the liability phase of the trial related to sexual harassment, the district court properly excluded the evidence relating to those allegations.

To the extent that the defendants may argue that even if such allegations are insufficient to support a search for evidence of sexual harassment, they are admissible to support a search based on a cumulation of unrelated types of misconduct, none of which may be sufficient in itself, we reject that argument. A specific link is required between the reason for the search and the objects to be seized. *See, e.g., Stanford,* 379 U.S. at 485–86, 85 S.Ct. 506. A suspicion that a person is a general wrong-doer is not enough to justify a search. Rather, a search can be conducted only when there is reason to suspect specific misconduct and that evidence of *that* misconduct will be found. When fraud or theft are suspected, for example, evidence of sexual harassment would be irrelevant.

19. The defendants do not mention qualified immunity in the section of their brief in which they appeal the district court's partial summary judgment order. Nor did they raise qualified immunity in the district court at the time the district judge ruled that the search and seizure of the Sutton materials was unreasonable. Assuming *arguendo* that the issue is not forfeited and that the defendants seek to raise it here (both highly dubious propositions), we are compelled to reject their qualified immunity argument for essentially the same reasons discussed *supra* in Part II and above in this section. In this case, there was no need to submit the issue to the jury because, even resolving all factual questions in the defendants' favor, they violated clearly established law in connection with the episode involving the Sutton materials. Moreover, even if the district court were required to put the question of qualified immunity regarding those materials to the jury, any error in not doing so was harmless. A careful review of the lengthy record in this case

reveals that Dr. Ortega, right up through his closing argument, contended that the defendants had used the false excuse of a need to conduct an inventory of state property as a pretext for engaging in a widespread, intrusive, and indiscriminate fishing expedition through all of the belongings in his office, including the most personal and private materials. Given the verdict, and the substantial evidence Dr. Ortega offers in support of his theory of the case, we must assume that the jury believed Dr. Ortega his version of the disputed facts. Thus, even if the defendants, in addition to their claim that they were concerned about Dr. Vaughan's complaint and the computer acquisition, had been allowed to attempt to justify their search on the basis that they reasonably believed that they could look for evidence of sexual harassment, we have little doubt that the jurors would have deemed that assertion a false justification as well, and that the outcome would have been the same.

Although the Supreme Court plurality opined in its earlier decision that as the record existed prior to any "evidentiary hearing in this case ... [t]he removal of the computer—together with the allegations of mismanagement of the residency program and sexual harassment—*may* have made the search reasonable at its inception under the standard we have set forth in this case," *O'Connor,* 480 U.S. at 726, 728, 107 S.Ct. 1492 (plurality opinion) (emphasis added), it is significant that the defendants' primary assertion throughout most of these proceedings was that they were conducting the search in order to inventory and secure state property, a practice supposedly followed when an employee has resigned or been terminated. More important, upon holding an *evidentiary hearing* following remand, the district court learned that the sexual harassment allegations that may have been known prior to the search to the defendants and other "investigators" were either extremely stale or extremely vague and general, and that they provided no basis for believing that evidence of sexual harassment would be found in Dr. Ortega's office. In light of the factual record that was developed following remand, the district court did not abuse its discretion in excluding the evidence relating to sexual harassment. Such evidence simply could not have served as the basis, in whole or in part, for the search. *See EEOC v. Pape Lift, Inc.,* 115 F.3d 676, 680 (9th Cir. 1997) (exclusion of evidence is reviewed for abuse of discretion); *cf. United States v. Marvin,* 720 F.2d 12, 14 (8th Cir.1983) (holding that court properly excluded allegation of sexual harassment when harassment-related conduct was minimally relevant to issues at trial).

In any event, as Dr. Ortega argued in his motion, the exclusion of the sexual harassment allegations was clearly proper under Rule 403. That rule permits district courts "to exclude relevant evidence on the ground of prejudice to the party against whom it is offered 'if its probative value is substantially outweighed by its prejudicial value.'" *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 151 (2d Cir.1997) (quoting Fed.R.Evid. 403). Even if

the sexual misconduct allegations had somehow been relevant to the trial's liability phase, sexual harassment, like other forms of discrimination and personal abuse, "deservedly carries a unique stigma in our society," *Frank v. County of Hudson,* 924 F.Supp. 620, 626–27 (D.N.J.1996), and courts, therefore, should exercise caution in allowing its introduction when its probative value is relatively weak. Given the district court's holding, with which we agree, that the evidence does not in itself justify the search, and given the vague and stale nature of the allegations, any probative value those allegations might have for the purposes of determining the validity of a search based on a theory of cumulative suspicion would be at best minimal. Thus, the district court did not abuse its discretion in excluding the sexual harassment evidence under Rule 403.

Finally, we note that, given our holding in Part III.A, any error with respect to the court's evidentiary ruling was harmless. *See, e.g., Pape Lift,* 115 F.3d at 680 (exclusion of evidence cannot result in a reversal of a verdict absent some prejudice). The district court's evidentiary holding applied only to the trial's liability phase, and even if the sexual harassment evidence were of *some* relevance, it is highly improbable that it would have affected the jury's verdict on that issue. We must assume that the jury rejected the defendants' version of the facts and believed Dr. Ortega's—that is, that the jury concluded that the defendants without sufficient reason deliberately conducted an indiscriminate and highly intrusive search through Dr. Ortega's most personal belongings in an effort to see whether any evidence could be discovered on any subject that might be of use in an adversary administrative proceeding; seized and held, for an unduly lengthy period of time, all of the possessions he maintained in his office; and later attempted to justify the search and seizure on a series of false grounds. Any error in not allowing the defendants to present yet another purported ground for their actions did not cause them prejudice, because we think it clear that the jury would have rejected that argument also and reached the decision it did in Dr. Ortega's favor.[20]

---

**20.** We note that the district court's rulings regarding the Sutton materials and the evidence    relating to sexual harassment did not apply to

## IV

It is now seventeen years since the search of Dr. Ortega's office occurred and his most personal letters and possessions were examined and seized. It is time to bring this matter to a conclusion. We have considered the defendants' remaining assertions regarding the district court's evidentiary rulings, the jury's damage awards, and the district court's award of attorney's fees, and we find them to be without merit. Accordingly, the judgment of the district court is

**AFFIRMED.**

the damages phase of the trial; at that phase, the Sutton materials *were* introduced into evidence and the defendants *were* permitted to explain that they had received allegations of sexual misconduct.