227 F.3d 1214 (9th Cir. 2000)
 ALEXANDRA WHITE, JOSEPH DERINGER, and RICHARD GRAHAM, Plaintiffs-Appellees
Cross-Appellants,
v.
RUSSELL LEE, in his individual and official capacities aka Bruce Lee; LYNN TAMIYASU-LEE, as special administrator of the estate of Russell Bruce Lee; LAVERA GILLESPIE, PAUL SMITH, ROBERT ZUROWSKI, and JOHN PHILLIPS, in their individual and official capacities, Defendants-Appellants-Cross-Appellees,
and
ELIZABETH JULIAN, in her official capacity, Defendant-Cross-Appellee.
 Nos. 99-15098, 99-15109, 99-16033
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted July 10, 2000
Filed September 27, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Robert M. Loeb, United States Department of Justice, Civil Division, Washington, D.C., for the defendants-appellants/ cross-appellees.
 Kenneth L. Marcus, Cooper, Carvin & Rosenthal, PLLC, Washington, D.C., Michael E. Rosman, General Counsel, Center, for Individual Rights, Washington, D.C., David DeGroot, San Francisco, California, for the plaintiffs-appellees/crossappellants.
 Margaret B. Demers, Sidley & Austin, Washington, D.C., for amicus curiae National Fair Housing Alliance.
 Appeal from the United States District Court for the Northern District of California. Marilyn H. Patel, District Judge, Presiding. D.C. No. CV-95-01757-MHP
 Before: William C. Canby, Jr., Stephen Reinhardt, Ferdinand F. Fernandez, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 This case involves the Fair Housing Act, 42 U.S.C.S 36013631, and the First Amendment. On November 1, 1993 a housing rights advocacy group filed an administrative complaint with an office of the U.S. Department of Housing and Urban Development (HUD) in San Francisco. The complaint alleged that three neighbors in Berkeley opposed the conversion of a motel into a multi-family housing unit because they believed that the project would bring people into the neighborhood who were mentally disabled or disabled through substance abuse. Upon receiving the complaint, the San Francisco HUD office initiated an eight-month investigation into the neighbors' activities and beliefs. During the course of its investigation, HUD officials questioned the neighbors under threat of subpoena about their views and public statements regarding the challenged project; directed them to produce an array of documents and information, including all involved parties' names, addresses, and telephone numbers and all correspondence or other documents relating to their efforts in opposition to the project; informed them and a major metropolitan newspaper that they had violated the Fair Housing Act; and advised them to accept a "conciliation proposal" that required them to cease all litigation and the distribution of "discriminatory" newsletters and flyers. The HUD officials in San Francisco recommended finding that the neighbors had violated the Fair Housing Act, but officials in Washington ultimately concluded that no violation had occurred and that the neighbors had engaged solely in activity protected by the First Amendment.
 
 
 2
 The three Berkeley neighbors then filed this civil rights action alleging that the investigation conducted by the HUD officials in San Francisco violated their First Amendment rights. The officials argue that they were required by the Fair Housing Act to investigate whether the neighbors had filed a lawsuit in state court with an unlawful discriminatory motive. At the very least, they argue, they are entitled to qualified immunity. The district court denied the officials' motion for summary judgment on the issue of qualified immunity, entered partial summary judgment in favor of the neighbors on the issue of liability, and dismissed as moot the neighbors' claim for declaratory and injunctive relief. Only the issue of damages remains for trial.[1] We affirm the district court in all respects.
 
 BACKGROUND
 A. Statement of Facts
 
 3
 The following facts are undisputed.
 
 1. The Parties
 
 4
 Plaintiffs Alexandra White, Joseph Deringer, and Richard Graham are residents of Berkeley, California. White and Deringer are married to each other. Graham is their neighbor.
 
 
 5
 At all times relevant to this case, defendant Elizabeth Julian was the assistant secretary of HUD for Fair Housing and Equal Opportunity (FHEO). Defendant LaVera Gillespie was the director of the Regional Office of FHEO in San Francisco ("the San Francisco Office"). Defendant Paul Smith was the San Francisco Office's investigations branch chief. Defendant Russell Bruce Lee (now deceased) was an investigator, and defendant Robert Zurowski was an investigator-conciliator. Defendant John Phillips was special assistant to the HUD regional administrator.
 
 2. Conversion of the Bel Air Motel
 
 6
 On May 12, 1992, a local nonprofit housing developer, Resources for Community Development (RCD), applied for a use permit from Berkeley's Zoning Adjustment Board. RCD sought to convert the Bel Air Motel, a property on University Avenue, to a multi-family housing unit for homeless persons. The use permit required approval by both the Zoning Adjustment Board and the Berkeley City Council.[2]
 
 
 7
 The plaintiffs lived close to the Bel Air Motel and were opposed to its proposed conversion. They expressed their opposition in a variety of ways. They wrote to the Berkeley City Council, spoke out before the Zoning Adjustment Board and at other public meetings, and published a newsletter with articles critical of the project. The front page of the February 1993 issue of the plaintiffs' newsletter, Flatland News, for example, contained an article titled "City Forcing Bel Air Project Down Our Throats." The plaintiffs discussed their opposition to the project with the local press and attempted to persuade merchants on University Avenue to oppose the Bel Air project also.
 
 
 8
 The Zoning Adjustment Board granted RCD its use permit on October 1, 1992. An appeal to the Berkeley City Council failed, by a 4-4 vote, in April 1993. That same month, a coalition in which plaintiffs were involved ("the Coalition of Neighborhood Groups Opposing the Bel Air Conversion") filed a lawsuit against Berkeley and RCD in state court. Plaintiff White verified the complaint. It alleged that one of the Zoning Adjustment Board's members, Linda Maio, was also a member of RCD's board and, because of this conflict of interest, improperly participated in the Zoning Adjustment Board's hearings. On April 19, the coalition moved for a preliminary injunction to prevent the issuance of an effective use permit. The Alameda County Superior Court denied the motion and set the case for trial on November 15, 1993. Although RCD's use permit became effective in May 1993, the developer thereafter experienced difficulty obtaining promised funds for the project from Berkeley and had to seek repeated extensions from other funders.
 
 
 9
 The Superior Court entered final judgment against the plaintiffs' coalition on February 3, 1994.
 
 3. HRI's Complaint to HUD
 
 10
 Marianne Lawless (now deceased) was the executive director of Housing Rights, Inc. ("HRI"), a Berkeley housing rights advocacy group. She had testified at a hearing in support of the Bel Air project. On October 15, 1993, Lawless wrote a letter to the San Francisco Office stating her intention to file a HUD administrative complaint against the plaintiffs. Lawless attached a letter dated October 12 from the executive director of RCD to the Housing and Civil Enforcement Section of the Department of Justice complaining about the plaintiffs' opposition to the Bel Air project.[3] Lawless also attached several flyers and other documents which, she stated, "demonstrate the discriminatory scare tactics used by the opponents."[4]
 
 
 11
 A HUD complaint intake analyst in the San Francisco Office (not a defendant here) spoke with Lawless about her complaint. The analyst wrote in a memorandum that "Ms. Lawless stated that these named residents, also known as the `Coalition of Neighborhood Group Opposing RCD Plan for the Bel-Air Conversion[,]' is [sic] a very vocal group who stand firm in their belief that the homeless persons moving into the area will be undesirables who are mentally disabled or disabled through substance abuse."
 
 
 12
 The analyst concluded that HUD had jurisdiction and should accept Lawless's complaint for processing, and a supervisor concurred. On October 26, the intake analyst drafted an administrative complaint against the plaintiffs on Form HUD-903. Boxes on the form were checked indicating that HRI had been "[i]ntimidated, interfered[with], or coerced . . . to keep [HRI] from the full benefit of the Federal Housing Law" and that the plaintiffs had engaged in discrimination on the basis of mental handicap. The complaint included the following statement written on HRI's behalf:
 
 
 13
 We are a fair housing agency in the city of Berkeley. As such, one of our missions is to ensure equal opportunities for all persons. The above named respondents have impaired our ability to ensure equal housing by impeding the proposed conversion of the Bel Air Motel to permanently house lowincome homeless persons. One of their principal arguments against this project is that it will benefit people that are diagnosed as mentally disabled or disabled through substance abuse. Although the respondents unsuccessfully attempted to obtain a preliminary injunction against the developer acquiring a use permit, they have been given a trial date for November 15, 1993. We believe the above named individuals are blocking the proposed project because they perceive the primary residents of the facility will be the mentally disabled or the disabled through substance abuse.
 
 
 14
 The San Francisco Office sent this draft complaint to Lawless, she signed it, and the complaint was filed on November 1, 1993.
 
 4. The San Francisco Office's Investigation
 
 15
 In early November 1993, the San Francisco Office sent letters to White, Deringer, and Graham. The office enclosed HRI's complaint and stated that the plaintiffs could file an answer within ten days. HUD, the letters stated, would "commence an investigation of this complaint, and simultaneously encourage all parties involved to conciliate the matter." If conciliation failed and HUD's investigation produced "evidence to substantiate a finding that there is reasonable cause to believe that you have engaged in an unlawful discriminatory housing practice," HUD would issue a charge against them, at which point they would be exposed to certain penalties -including damages as great as $100,000 -and could elect to have their case heard by an administrative law judge or referred for trial in U.S. District Court.[5] The plaintiffs filed answers to the complaint on November 12.
 
 
 16
 Defendant Smith assigned the complaint to defendant Lee to investigate and defendant Zurowski to conciliate. On December 17, 1993, Lawless sent Zurowski a "Proposal for Conciliation" containing the following settlement terms:
 
 
 17
 1) That the above named respondents [White, Deringer, and Graham], and the Neighborhood Groups Opposing the Bel Air Conversion, cease all litigation against Resources for Community Development and the City of Berkeley regarding the development of the Bel Air Motel; and
 
 
 18
 2) That the above named respondents, and the Neighborhood Groups Opposing the Bel Air Conversion, cease publication of discriminatory statements (including articles in the CNA Newsletter) and fliers about the potential residents of the Bel Air project.
 
 
 19
 Zurowski relayed these proposed terms to the plaintiffs. According to a declaration by the attorney then representing the plaintiffs, David Bryden, Zurowski told him "that the proposed settlement was a good one because my clients had, in fact, engaged in discriminatory actions in violation of the Fair Housing Act -I recall him telling me that HUD had evidence of a flyer which demonstrated such a violation -and that I should be relieved that my clients would not also have to pay damages to the complainant."[6]
 
 
 20
 On January 12, 1994, Lee drafted and Smith reviewed and signed, on behalf of the San Francisco Office's compliance director, a letter to the three plaintiffs. It stated that the San Francisco Office was investigating HRI's complaint and that it was HUD policy "to secure the voluntary cooperation of all persons in the collection of information during the investigation." The letter continued:
 
 
 21
 When access to premises, records, documents, individuals and other possible sources of information and evidence which may be necessary for the furtherance of the investigation is not provided, the Department may issue subpoenas to compel such access, production or testimony. Any person who willfully fails or neglects to attend and testify or to answer any lawful inquiry or to produce records, documents or other evidence in obedience to a subpoena "shall be fined not more than $100,000 or imprisoned not more than one year, or both."
 
 
 22
 Attached to the letter was an "Attachment of Request to Produce Written Responses" listing ten items. This request was extremely broad. It directed the plaintiffs to submit, inter alia, the name and contact information of any person "who was involved in or witnessed the act(s) alleged on the complaint form"; "a copy of any documents or the contents of any file in your control concerning the Bel Air Motel conversion"; all correspondence with or minutes or reports generated by the Council of Neighborhoods Association regarding the Bel Air project; and all literature, posters, newsletters, and flyers about the project. On January 18, the plaintiffs, through their attorney, stated that they did not have some of the documents sought and that they refused to provide the others. HUD did not take any further action to obtain these documents from the plaintiffs.
 
 
 23
 On February 1, Smith told the plaintiffs' attorney Bryden that HUD would issue a subpoena to compel the plaintiffs' testimony if they refused to be interviewed by Lee. Bryden agreed that Lee could interview the plaintiffs by telephone. The interview took place on February 7 and lasted for about one hour. Lee asked the plaintiffs why they were opposed to the Bel Air project and what statements they had made about the project to the public. Lee later testified in a deposition that Smith had directed him to ask the plaintiffs these questions, which Lee had considered irregular and beyond the scope of a routine FHA investigation.
 
 
 24
 On February 8, pursuant to Lee's request, Bryden sent Lee a memorandum from the Berkeley City Manager stating that Zoning Adjustment Board member Linda Maio had a conflict of interest on the RCD matter. Sometime during the investigation, Smith also became aware that there was reason to believe that Maio had a conflict of interest.
 
 
 25
 The Fair Housing Act requires HUD to provide a written statement of reasons in the event that it is "impracticable" to complete an investigation within 100 days. See 42 U.S.C. 3610(a)(1)(B)(iv), 3610(a)(1)(C). On February 10, Bryden called Lee to inquire about the status of the investigation. On February 15, the Director of HUD's Office of Investigations in Washington, D.C. informed HRI and the plaintiffs by letter that although the processing of the administrative complaint was not yet complete, HUD was "expediting this matter." However, the San Francisco Office's final investigative report shows that the investigators' first contact with a witness other than the plaintiffs was on May 17, 1994, an interview with the executive director of RCD. All other contacts with witnesses took place in mid-June 1994.
 
 
 26
 On June 24, Bryden wrote a letter asserting that HUD's investigation was an effort to chill the plaintiffs' constitutional rights. He asked that the investigation be terminated. Smith drafted a letter in response, which defendant Gillespie signed on July 14. This letter stated that "numerous court opinions" had established HUD's jurisdiction over the case:
 
 
 27
 The Department has jurisdiction over all claims under the federal Fair Housing Act concerning land use and zoning. This jurisdiction has been recognized uniformly to extend to allegations that individuals have engaged in speech advocating illegal acts, including discrimination against persons based on their physical or mental disabilities.
 
 
 28
 The Complainant in the above case alleged that your clients advocated the denial by the City of Berkeley of a use permit to a nonprofit housing developer for the conversion of the Bel Air Motel to a homeless shelter because, among other reasons, the residents of the project would be mentally disabled. Evidence was produced during the investigation that your clients wrote news articles which referenced the mental disability of the intended residents of the proposed project as a reason for denial of the project.
 
 
 29
 The letter further stated that HRI had suffered an injury sufficient to establish its standing to pursue relief under the Fair Housing Act because its director, Lawless, "devoted time and resources to advocating on behalf of the developer of the Bel Air project, in opposition to your clients."
 
 
 30
 Lee submitted a draft of the final investigative report to Smith on June 17, 1994. After further revisions by Smith and review by Gillespie, the San Francisco Office adopted the report and, on July 11, sent it and the entire case file to HUD headquarters in Washington. The report concluded that the plaintiffs had violated the Fair Housing Act and that there was reasonable cause to take further enforcement action against them. On July 22, 1994, the San Francisco Examiner reported that defendant Phillips had said "that HUD's preliminary investigation had concluded the three residents[White, Deringer, and Graham] had broken the law, but that it would be up to HUD and Justice Department attorneys to decide whether to prosecute."
 
 5. Disposition of HRI's Complaint
 
 31
 For approximately two weeks Sara Pratt, the director of HUD's Office of Investigations in Washington, reviewed HRI's complaint and the San Francisco Office's report and case file. Finding that the file contained "little if any" information on the state-court lawsuit filed by the plaintiffs' organization, Pratt asked the San Francisco Office to obtain documents and information regarding that action. Upon receiving these materials, Pratt determined that the Alameda County Superior Court had in fact found that Linda Maio's simultaneous service on the Zoning Adjustment Board and RCD's board constituted a conflict of interest that violated a Berkeley ordinance. The court, however, had "found no violation of state law requiring invalidation of the use permit, and considered the good faith of the zoning board member in doing so." Pratt concluded:
 
 
 32
 [A]t the time the complaint was filed, on November 1, 1993, the lawsuit presented material questions of fact and/or of law and was not clearly frivolous. Moreover, the state court decision in the case, entered in February 1994, indicated that the lawsuit was premised on a reasonable basis in fact or in law (that is, that it stated a violation of a local ordinance) and, but for the "good faith" exception contained in state law, would have constituted a successful legal aim. The respondents' actions in instituting and prosecuting a lawsuit are thus protected by the First Amendment.
 
 
 33
 Pratt also concluded that the plaintiffs' distribution of flyers and newsletters and lobbying of public officials were activities protected by the First Amendment and did not constitute a violation of the Fair Housing Act. HUD issued a "Determination of No Reasonable Cause" on August 16, 1994.
 
 B. Proceedings Below
 
 34
 The plaintiffs filed their complaint in May 1995. They alleged that defendants Gillespie, Smith, Lee, Zurowski, and Phillips investigated and harassed them solely because of the exercise of their First Amendment rights to free speech and to petition the government for a redress of grievances. The plaintiffs sued these defendants in their official and individual capacities, pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and requested declaratory and injunctive relief, damages, and attorneys' fees. They sued defendant Julian only in her official capacity, for declaratory and injunctive relief.
 
 
 35
 The HUD officials initially moved to dismiss the complaint. Ultimately, the court refused to do so, except for the claim for prospective relief. With respect to that claim, the district court first found that while the plaintiffs were not currently under investigation by HUD, they had sufficiently alleged "that they are engaging or will in the future likely engage in activities similar to those that precipitated the HUD investigation in this case." However, because HUD had implemented and memorialized a new policy prohibiting agency investigations into protected First Amendment activity and the plaintiffs had not alleged any specific objectionable conduct occurring after the implementation of that policy, the district court concluded that there was no live controversy under Article III. Accordingly, pursuant to Federal Rule of Civil Procedure 12(b)(1), it dismissed the plaintiffs' claim for prospective relief as moot.
 
 
 36
 After discovery, the parties filed cross-motions for summary judgment. All five officials sued in their individual capacities argued that they were entitled to qualified immunity. Defendant Lee also moved for summary judgment on the ground that the plaintiffs had failed to establish his liability for any violation of the First Amendment. For their part, the plaintiffs moved for partial summary judgment against Lee, Smith, Zurowski, and Gillespie on the issue of liability. On December 18, 1998, the district court denied the defendants' motions and granted the motion of the plaintiffs.[7]
 
 
 37
 The defendants filed timely notices of appeal. Pursuant to Federal Rule of Civil Procedure 54(b), the district court granted the plaintiffs' motion, consented to by the defendants, to certify for appeal as a final judgment the court's August 1996 dismissal of their claim for injunctive and declaratory relief. The plaintiffs then filed a timely cross-appeal.
 
 ANALYSIS
 
 38
 We consider, in turn, (1) the HUD officials' appeal of the district court's denial of their motion for summary judgment on the ground of qualified immunity, (2) the officials' appeal of the entry of partial summary judgment on the issue of liability, and (3) the plaintiffs' appeal of the dismissal of their claim for prospective relief.
 
 I. DENIAL OF QUALIFIED IMMUNITY
 A. Jurisdiction
 
 39
 Although the denial of a summary judgment motion is not ordinarily appealable, this court has jurisdiction to review an order denying a government official summary judgment on the ground of qualified immunity. Schwenk v. Hartford, 204 F.3d 1187, 1195 (9th Cir. 2000) (citing Behrens v. Pelletier, 516 U.S. 299, 312 (1996)). "Our jurisdiction in such cases, however, is limited to questions of law; it does not extend to claims in which the determination of qualified immunity depends upon disputed issues of material fact." Id. (citing Johnson v. Jones, 515 U.S. 304, 319 (1995); Knox v. Southwest Airlines, 124 F.3d 1103, 1106 (9th Cir. 1997)). This court reviews de novo the denial of a motion for summary judgment on the ground of qualified immunity. Katz v. United States, 194 F.3d 962, 966 (9th Cir. 1999) (citing Knox, 124 F.3d at 1105), petition for cert. filed, 68 U.S.L.W. 3774 (U.S. June 8, 2000) (No. 99-1977); Calabretta v. Floyd , 189 F.3d 808, 812 (9th Cir. 1999). Here, the material facts are not in dispute, and the issues involve only questions of law. Thus, we have jurisdiction over the qualified immunity appeal.
 
 
 40
 B. Have the Plaintiffs Stated a First Amendment Claim?
 
 
 41
 The Supreme Court has held that, in analyzing the defense of qualified immunity, courts must decide first whether the plaintiff has stated a proper claim for a violation of a right, then whether the right at issue was "clearly established" at the time the alleged violation occurred. Wilson v. Layne, 526 U.S. 603, 609 (1999); Conn v. Gabbert, 526 U.S. 286, 290 (1999); see also Schwenk, 204 F.3d at 1196; Knox, 124 F.3d at 1107. Accordingly, we begin by addressing the merits of the plaintiffs' First Amendment claim.
 
 
 42
 1. The Plaintiffs' First Amendment Activity and the Defendants' Chilling Conduct
 
 
 43
 Although the HUD officials frame this case in terms of a complex doctrinal debate involving Noerr-Pennington immunity and its labor law permutation, we find it to be, at heart, quite simple. In opposing their local government's approval of the Bel Air project, White, Deringer, and Graham engaged in activity paradigmatically protected by the First Amendment. The HUD officials' eight-month investigation into the plaintiffs' activities and beliefs chilled the exercise of their First Amendment rights. The plaintiffs are entitled to seek a remedy for this constitutional violation.
 
 
 44
 a. The Speech
 
 
 45
 The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." Here, the plaintiffs wrote and distributed flyers and published a newsletter in the advocacy of a politically controversial viewpoint -"the essence of First Amendment expression." See McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347 (1995) (citations omitted); see also Mills v. Alabama, 384 U.S. 214, 219 (1966) ("The Constitution specifically selected the press, which includes not only newspapers, books, and magazines, but also humble leaflets and circulars, to play an important role in the discussion of public affairs.") (citation omitted). They organized and participated in a coalition of neighbors who shared their views, admirable or not. Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984) ("[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.") (citations omitted); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460 (1958) (describing as "beyond debate" that freedom of speech encompasses "freedom to engage in association for the advancement of beliefs and ideas") (citations omitted). The right to expressive association includes the right to pursue, as a group, discriminatory policies that are antithetical to the concept of equality for all persons. See Boy Scouts of America v. Dale, _______ U.S. _______, _______, 120 S. Ct. 2446, 2457-58 (2000).
 
 
 46
 The First Amendment also guarantees the right "to petition the Government for a redress of grievances. " The plaintiffs exercised this right by attending and speaking out at Zoning Adjustment Board hearings and by challenging in the courts the board's decision to grant a use permit for the Bel Air project. See, e.g., Christian Gospel Church, Inc. v. City & County of San Francisco, 896 F.2d 1221, 1226 (9th Cir. 1990) (neighbors who opposed zoning permit application by church "by circulating a petition, testifying before the Planning Commission and writing letters to the editor" were "fully protected by the first amendment"); Evers v. County of Custer, 745 F.2d 1196, 1204 (9th Cir. 1984) (activity of property owners who urged county officials not to close what they believed was public road "falls within the first amendment's protection of the right to petition the government for redress of grievances") (citing Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961)). Regardless of what we might think of their objectives, the plaintiffs "were doing what citizens should be encouraged to do, taking an active role in the decisions of government." Christian Gospel Church, 896 F.2d at 1226.
 
 
 47
 It is important to emphasize that a person's speech or petitioning activity is not removed from the ambit of First Amendment protection simply because it advocates an unlawful act. The First Amendment does not permit government "to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Brandenburg v. Ohio, 395 U.S. 444, 447 (1969); see also NAACP v. Claiborne Hardware Co., 458 U.S. 886, 928 (1982); Noto v. United States, 367 U.S. 290, 291 (1961); Yates v. United States, 354 U.S. 298, 318 (1957) overruled in part on other grounds by Burks v. United States, 437 U.S. 1, 7, 12 (1978). Advocacy is unprotected only if it is "intended to produce, and likely to produce, imminent disorder"; "advocacy of illegal action at some indefinite future time" is not actionable. Hess v. Indiana, 414 U.S. 105, 108-09 (1973).
 
 
 48
 It is clear that the term "advocacy," as used in Brandenburg, encompasses not only freedom of speech, but the other rights of expression guaranteed by the First Amendment as well. Brandenburg specifically held that"[s]tatutes affecting the right of assembly, like those touching on freedom of speech, must observe the established distinctions between mere advocacy and incitement to imminent lawless action." 395 U.S. at 449 n.4. See also Communist Party of Indiana v. Whitcomb, 414 U.S. 441, 448-50 (1974) (applying Brandenburg principles to state regulation of access to the ballot). The Supreme Court has also explained that the right to petition is "inseparable" from and "was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble." McDonald v. Smith, 472 U.S. 479, 485 (1985) (citations omitted).
 
 
 49
 We need not decide whether the plaintiffs' primary objective -the defeat of the proposed conversion of the Bel Air motel -would have involved an unlawful act. The mere fact that citizens urge their government to adopt measures that may be unlawful does not deprive the speech involved of its First Amendment protection. Cf. Manistee Town Ctr. v. City of Glendale, 227 F.3d. 1090 (9th Cir. 2000) (affirming dismissal under Noerr-Pennington doctrine of complaint challenging lobbying of county officials that allegedly resulted in unconstitutional taking of plaintiff's property). Here, it is clear that nothing that the plaintiffs said or did came close to meeting the Brandenburg test. "Imminent lawless action," as used in Brandenburg , means violence or physical disorder in the nature of a riot. Peaceful speech, even speech that urges civil disobedience, is fully protected by the First Amendment. Were this not the case, the right of Americans to speak out peacefully on issues and to petition their government would be sharply circumscribed. We therefore hold that the standard set forth in Brandenburg applies to all the First Amendment activity at issue in this case, including plaintiffs' petitioning activity, regardless of whether the denial of the permit on the grounds urged would have been contrary to the provisions of the Fair Housing Act.
 
 
 50
 b. The Chill
 
 
 51
 The investigation by the HUD officials unquestionably chilled the plaintiffs' exercise of their First Amendment rights. It is true that the agency did not ban or seize the plaintiffs' materials, and officials in Washington ultimately decided not to pursue either criminal or civil sanctions against them. But in the First Amendment context, courts must "look through forms to the substance" of government conduct. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963). Informal measures, such as "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation," can violate the First Amendment also. Id.[8] This court has held that government officials violate this provision when their acts "would chill or silence a person of ordinary firmness from future First Amendment activities." Mendocino Environmental Ctr. v. Mendocino County, 192 F.3d 1283, 1300 (9th Cir. 1999) (citation omitted). Here, the type of investigation conducted and the manner in which the individual defendants carried out their functions more than meets that standard.
 
 
 52
 The HUD officials carried out an investigation that lasted more than eight months, substantially longer than the presumptive 100-day time limit set by 42 U.S.C. 3610(a)(1) (B)(iv). During the investigation, defendant Zurowski conveyed a conciliation proposal requiring the plaintiffs to cease all litigation and publications regarding the Bel Air project and advised the plaintiffs to accept it because they had violated the Fair Housing Act by distributing "discriminatory" flyers. Defendants Lee and Smith directed the plaintiffs under threat of subpoena to produce all their publications regarding the Bel Air project, minutes of relevant meetings, correspondence with other organizations, and the names, addresses, and telephone numbers of persons who were involved in or had witnessed the alleged discriminatory conduct.[9] Smith interrogated the plaintiffs, again under threat of subpoena, about their views and public statements in opposition to the Bel Air project. In a letter drafted by Smith, defendant Gillespie asserted HUD's purported authority to investigate "allegations that individuals have engaged in speech advocating illegal acts, including discrimination against persons based on their physical or mental disabilities" and stated that the plaintiffs had violated the Fair Housing Act by writing "news articles which referenced the mental disability of the intended residents of the proposed project as a reason for denial of the project." Defendant Phillips told a major metropolitan newspaper that the plaintiffs had "broken the law."[10] We conclude that these actions would have chilled or silenced a person of ordinary firmness from engaging in future First Amendment activities.
 
 2. The FHA as a Justification
 
 53
 The HUD officials argue that their actions constituted lawful efforts to enforce the Fair Housing Act (FHA). The purpose of that statute is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. 3601. The FHA prohibits, among other things, owners and landlords from refusing to sell or rent housing because of race, color, religion, sex, handicap, familial status, or national origin. See id. at 3604.[11] The FHA also makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." Id. at 3617, 3602(f). A violation of this provision is considered a "discriminatory housing practice " for which an "aggrieved person" may file an administrative complaint with HUD. Id. at 3610(a)(1)(A)(i). If this occurs, HUD must serve notices upon the complainant[12] and the respondents[13] and "make an investigation of the alleged discriminatory housing practice and complete such investigation within 100 days after the filing of the complaint . . . unless it is impracticable to do so." Id. at 3610(a)(1)(B)(iv).
 
 
 54
 We have applied 3617 broadly to cover a variety of practices that have the effect of interfering with the exercise of fair housing rights protected by the FHA. See United States v. City of Hayward, 36 F.3d 832, 835 (9th Cir. 1994) (" `Interference' ranges from racially motivated firebombings, to exclusionary zoning, and insurance redlining.") (citations omitted). In theory, 3617 could be interpreted even more broadly, so that a wide range of speech regarding the housing rights of others could be investigated and sanctioned. One person's persuasive editorial on a zoning dispute, for instance, might well "interfere" with another person's ability to secure housing. So construed, however, 3617 would quickly run afoul of the First Amendment principles discussed above.
 
 
 55
 For this reason, other courts have recognized that a speaker's advocacy of his views, however "ill-advised, uninformed, and even distasteful," can amount to a violation of 3617 of the FHA only in the event that the advocacy is directed to inciting or producing imminent violence and is likely in fact to do so. We agree. See Michigan Protection & Advocacy Serv., Inc. v. Babin, 799 F. Supp. 695, 720 (E.D. Mich. 1992), aff'd, 18 F.3d 337 (6th Cir. 1994); see also United States v. Wagner, No. 3:94-CV-2540-H, 1995 WL 841924, at *5 (N.D. Tex. Dec. 11, 1995) ("[T]he Pines have not presented evidence that the petitioning activities were likely to incite imminent lawless action, despite the overtones of the leaflets.") (citing Brandenburg, 395 U.S. at 447). Threats of violence and other forms of coercion and intimidation directed against individuals or groups are, however, not advocacy, and are subject to regulation or prohibition. See United States v. Gilbert, 813 F.2d 1523, 1529-30 (9th Cir. 1987) (holding that criminal prosecution under FHA of person who mailed letters and flyers threatening to murder whites who aided blacks and other minorities was not precluded by First Amendment). In this case, no such acts were alleged.
 
 
 56
 Although the HUD officials now concede that the plaintiffs' "protest activities of writing newspaper articles, leafleting, etc., [were], of course, constitutionally protected forms of speech," they suggest parenthetically in their brief that their investigation was necessary to determine whether the flyers distributed by the plaintiffs involved an incitement to imminent lawless action. This suggestion is not supported by the record. HRI executive director Lawless sent a letter to the San Francisco Office that enclosed the relevant flyers two weeks before she signed the complaint. The officials did not need to gather additional information before determining whether these flyers incited imminent lawless action or not. That the First Amendment protected the authors and distributors of the flyers was plain.
 
 
 57
 3. The Plaintiffs' Lawsuit as a Justification
 
 
 58
 In attempting to justify their eight-month investigation, the HUD officials rely mainly on the lawsuit filed by the plaintiffs' neighborhood coalition in April 1993. An unsuccessful state-court lawsuit, the officials argue, can violate the FHA if it is filed with a discriminatory motive; their theory is essentially that the First Amendment does not protect litigants who lose. Because the state court denied the plaintiffs their requested relief in February 1994, the HUD officials maintain that, after HRI filed its complaint in November 1993, they were entitled to investigate the plaintiffs' speech in opposition to the Bel Air project to determine whether they had filed their suit with an unlawful discriminatory motive. Cf. Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993). In making this argument, the officials rely principally on Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731 (1983), and Diamond Walnut Growers, Inc. v. NLRB, 53 F.3d 1085 (9th Cir. 1995), two cases we discuss below.
 
 
 59
 In dissecting the serious flaws in the officials' argument, it is necessary to examine carefully the protection that the First Amendment affords to individuals who petition the government for redress of grievances through the courts. In the end, however, we conclude that whether or not the HUD officials had the right to conduct a limited investigation at the outset, and whether or not in some circumstances a lawsuit may be stripped of its First Amendment protection simply because the plaintiffs fail to prevail on the merits, the investigation that the HUD officials conducted exceeded the bounds of reasonable governmental action and violated the plaintiffs' First Amendment rights.
 
 
 60
 a. Noerr-Pennington immunity
 
 
 61
 The Supreme Court has described the right to petition as "among the most precious of the liberties safeguarded by the Bill of Rights" and "intimately connected, both in origin and in purpose, with the other First Amendment rights of free speech and free press." United Mine Workers, Dist. 12 v. Illinois State Bar Ass'n, 389 U.S. 217, 222 (1967). It is "cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular freedom of expression." McDonald v. Smith, 472 U.S. at 482.
 
 
 62
 The Court has further established that the right to petition extends to all departments of the government, including the executive department, the legislature, agencies, and the courts. California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972). California Motor Transport involved Noerr-Pennington immunity, a doctrine initially promulgated "to protect efforts to influence legislative or executive action from liability under the Sherman Act. " Oregon Natural Resources Council v. Mohla, 944 F.2d 531, 533 (9th Cir. 1991) (citing Noerr, 365 U.S. 127; United Mine Workers v. Pennington, 381 U.S. 657 (1965)). While the NoerrPennington doctrine originally arose in the antitrust context, it is based on and implements the First Amendment right to petition and therefore, with one exception we discuss infra (see Section I.B.3.b), applies equally in all contexts. See Manistee Town Ctr., 227 F.3d. at 1092 ("The immunity is no longer limited to the antitrust context . . . .") (citing Boulware v. Nevada Dep't of Human Resources, 960 F.2d 793, 800 (9th Cir. 1992); Evers v. County of Custer, 745 F.2d at 1204)); ONRC v. Mohla, 944 F.2d at 533-34 ("The protection has been expanded to apply to petitions to courts and administrative agencies, as well as to preclude claims other than those brought under the antitrust laws.") (citations omitted).
 
 
 63
 The Noerr-Pennington doctrine ensures that those who petition the government for redress of grievances remain immune from liability for statutory violations, notwithstanding the fact that their activity might otherwise be proscribed by the statute involved. See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56 (1993). Noerr-Pennington is a label for a form of First Amendment protection; to say that one does not have NoerrPennington immunity is to conclude that one's petitioning activity is unprotected by the First Amendment.[14] With respect to petitions brought in the courts, the Supreme Court has held that a lawsuit is unprotected only if it is a "sham" -i.e., "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." Id. at 60. See also California Motor Transp., 404 U.S. at 513 (stating that First Amendment protection would not extend to "a pattern of baseless, repetitive claims . . . [that lead] the factfinder to conclude that the administrative and judicial processes have been abused").
 
 
 64
 In Professional Real Estate Investors, the Supreme Court rejected the contention that regardless of a lawsuit's objective merit an antitrust defendant can be found liable if the plaintiff showed that it brought the suit for a "predatory motive." See 508 U.S. at 55-56. Both requirements must be met to establish antitrust liability: "an objectively reasonable effort to litigate cannot be sham regardless of subjective intent." Id. at 57. Furthermore, proof of a lawsuit's objective base-less-ness is the "threshold prerequisite": a court may not even consider the defendant's allegedly illegal objective unless it first determines that his lawsuit was objectively baseless. Id. at 55, 60-61.
 
 
 65
 The fact that a litigant loses his case does not show that his lawsuit was objectively baseless for purposes of Noerr-Pennington immunity:
 
 
 66
 A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham. On the other hand, when the antitrust defendant has lost the underlying litigation, a court must "resist the understandable temptation to engage in post hoc reasoning by concluding" that an ultimately unsuccessful "action must have been unreasonable or without foundation." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421-22 (1978)). Accord Hughes v. Rowe, 449 U.S. 5, 14-15 (1980) (per curiam). The court must remember that "[e]ven when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." Christiansburg, supra, 434 U.S. at 422.
 
 
 67
 508 U.S. at 60 n.5 (citations modified). Professional Real Estate Investors itself involved a copyright action that had been defeated on summary judgment. See id. at 52-53. Because this action "was arguably `warranted by existing law' or at the very least was based on an objectively`good faith argument for the extension, modification, or reversal of existing law,' " the Supreme Court affirmed the lower court's decision rejecting the antitrust counterclaim. Id. at 65 (quoting Fed. R. Civ. P. 11). See also Liberty Lake Invs., Inc. v. Magnuson, 12 F.3d 155, 157-58 (9th Cir. 1993). We do not lightly conclude in any Noerr-Pennington case that the litigation in question is objectively baseless, as doing so would leave that action without the ordinary protections afforded by the First Amendment, a result we would reach only with great reluctance.[15]
 
 
 68
 Applying these principles to the present case, it follows that the plaintiffs' state-court lawsuit could have amounted to a discriminatory housing practice only in the event that (1) no reasonable litigant could have realistically expected success on the merits, and (2) the plaintiffs filed the suit for the purpose of coercing, intimidating, threatening, or interfering with a person's exercise of rights protected by the FHA. Because, in the present case, the first requirement cannot be sustained, we need not even consider the second. Objective baselessness is the sine qua non of any claim that a particular lawsuit is not deserving of First Amendment protection.[16] The lawsuit filed by the plaintiffs was unquestionably not objectively baseless. Far from it: it challenged a rather egregious conflict of interest by a person who was simultaneously a member of both the Zoning Adjustment Board and the board for the developer seeking the Bel Air use permit. As the director of HUD's Office of Investigations ultimately concluded, the plaintiffs' action "would have constituted a successful legal claim" but for the court's application of the "good faith" exception under California law.
 
 
 69
 The HUD officials protest that they could not ascertain from the face of HRI's administrative complaint whether the plaintiffs' lawsuit in fact had an objective basis. The complaint did not mention the conflict of interest that lay at the heart of the litigation. Instead, the complaint simply stated that (1) the plaintiffs had filed a lawsuit seeking to stop RCD from receiving a use permit for the Bel Air project, (2) they had failed in their efforts to obtain a preliminary injunction, and (3) HRI believed that the plaintiffs were "blocking" the Bel Air project "because they perceive the primary residents of the facility will be the mentally disabled or the disabled through substance abuse." The officials argue that while it did not say so explicitly, HRI's complaint at least raised the possibility that the plaintiffs' lawsuit was objectively baseless, that its sole purpose was to cripple the Bel Air project by causing undue delay and the imposition of substantial legal costs on its supporters, and therefore that the state-court action constituted a discriminatory housing practice under the FHA.[17] The officials contend that on that basis they were entitled, and indeed required by 3610(a)(1)(B) of the FHA, to investigate this matter.
 
 
 70
 We agree that the San Francisco Office was justified in accepting HRI's complaint. Furthermore, the mere fact that the officials provided the plaintiffs with a copy of HRI's complaint and informed them of their rights and duties under the FHA, pursuant to 3610(a)(1)(B)(ii), did not in itself violate the plaintiffs' rights under the First Amendment. As we have explained earlier, however, the critical issue is not whether the HUD officials were justified in accepting HRI's complaint and initiating some form of limited investigation, but whether the manner in which they actually conducted their eight month investigation violated the plaintiffs' First Amendment rights.
 
 
 71
 This court has held that when an action involves "the right to petition governmental bodies under Noerr-Pennington," it is necessary to apply a "heightened level of protection . . . to avoid `a chilling effect on the exercise of this fundamental First Amendment right.' " ONRC v. Mohla, 944 F.2d at 533 (quoting Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Bd., 542 F.2d 1076, 1082 (9th Cir. 1976)). Because the plaintiffs' lawsuit could have been actionable under the FHA if and only if it were a sham, the officials were obligated to first determine that the suit was objectively baseless before proceeding with any potentially chilling investigation into the plaintiffs' protected speech and other petitioning activity -even for the stated purpose of determining whether the plaintiffs had filed the suit with an unlawful discriminatory intent. As with the methodology mandated by the Supreme Court for judicial review of lawsuits, see Professional Real Estate Investors , 508 U.S. at 6061, a determination of objective baselessness of the litigation is a constitutionally required precondition to any investigation into the nature of the plaintiffs' advocacy.
 
 
 72
 The HUD officials completely failed to satisfy this threshold requirement. From the time they initiated their investigation until the time they submitted their final report to the Washington office, the officials made little or no effort to investigate the basis for the plaintiffs' suit. Instead, their investigation focused almost exclusively on what the officials considered to be the plaintiffs' discriminatory speech. Director Gillespie's two-page, single-spaced letter of July 1994 broadly asserted HUD's purported jurisdiction to investigate "speech advocating illegal acts" and cited reprovingly the plaintiffs' "news articles which referenced the mental disability" of the Bel Air project's intended residents; it did not, however, mention the plaintiffs' lawsuit once. Likewise, investigator Smith did not ask the plaintiffs any questions about the lawsuit during his interviews. Most striking, the officials completed and submitted to HUD headquarters a final investigative report that failed to include any information about the plaintiffs' lawsuit more substantial than what was set forth in HRI's complaint. After receiving the San Francisco Office's investigative materials, and analysis, and its finding of "reasonable cause" to believe that the plaintiffs had violated the FHA, Director Pratt in the Office of Investigations felt compelled to direct the San Francisco Office to supplement the report with information and documents on the lawsuit. This is in spite of the fact that on February 8, 1994, the plaintiffs' attorney had sent investigator Lee a memorandum from the Berkeley City Manager acknowledging the conflict of interest that was the subject of the plaintiffs' action.
 
 
 73
 These undisputed facts show that the San Francisco HUD officials conducted their eight-month investigation, primarily if not exclusively, into and in response to the plaintiffs' purportedly unlawful speech and not in connection with their state-court lawsuit. Having ignored the factual and legal basis for that litigation throughout, and instead having taken a course certain to chill the exercise of the plaintiffs' First Amendment rights, the officials may not now argue that their investigation was justified as a means of determining whether the plaintiffs had violated the FHA by filing a sham lawsuit.
 
 
 74
 b. Bill Johnson's
 
 
 75
 The HUD officials strongly argue, however, that most of the investigatory period occurred after the state court entered judgment against the plaintiffs, and because of that adverse judgment there was no need for the officials to inquire into the lawsuit's objective basis. This argument is based on the theory that the Noerr-Pennington "sham" rule that protects all but frivolous suits applies in antitrust cases only and therefore does not apply to the plaintiffs' lawsuit. The officials assert that a decision from the realm of labor law, Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731 (1983), rather than Noerr-Pennington, sets forth the appropriate rule for the case before us. Under Bill Johnson's, according to the HUD officials, if a plaintiff loses its lawsuit, all that it is necessary to show is that the suit was filed with a discriminatory motive; whether or not there was an objective basis for the legal action is immaterial.
 
 
 76
 In Bill Johnson's a waitress filed unfair labor practice charges with the National Labor Relations Board (NLRB), alleging that she had been fired for her efforts to organize a union. 461 U.S. at 733. The restaurant sued her in state court, alleging that while picketing she had harassed customers, blocked access to the restaurant, threatened public safety, and libeled the restaurant in her leaflets. Id. at 734. The waitress then filed a second charge with the NLRB, alleging that the restaurant had violated 29 U.S.C. 158(a)(1) of the National Labor Relations Act (NLRA), which makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights" guaranteed under that act. See 461 U.S. at 734-35. The NLRB found that the restaurant's lawsuit lacked a reasonable basis in fact and was filed to penalize the waitress for engaging in protected activity, and it ordered the restaurant to withdraw its state-court complaint and undertake a number of additional remedial measures. Id. at 737.
 
 
 77
 The Supreme Court vacated and remanded. It observed that 158(a)(1) was a broad, remedial provision intended to guarantee employees the ability to enjoy their rights under the NLRA, and that "[a] lawsuit no doubt may be used by an employer as a powerful instrument of coercion or retaliation." Id. at 740. On the other hand, the Court wrote, "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." Id. at 741 (citing California Motor Transp., 404 U.S. at 510). It cited its construction of the antitrust laws "as not prohibiting the filing of a lawsuit, regardless of the plaintiff's anticompetitive intent or purpose in doing so, unless the suit was a `mere sham' filed for harassment purposes." Id. (citing California Motor Transp., 404 U.S. at 511). The NLRA had to be construed with a similar sensitivity to "these First Amendment values," the Court said. Id. It therefore concluded that the California Motor Transport rule for "sham litigation" applied to the NLRA as well. The NLRB could enjoin a statecourt lawsuit as an unfair labor practice only if the employer was "prosecut[ing] a baseless lawsuit with the intent of retaliating against an employee for the exercise of rights protected by [S 158]." Id. at 744. An injunction would be improper if there was "any realistic chance that the plaintiff's legal theory might be adopted." Id. at 747.
 
 
 78
 Notwithstanding the foregoing analysis and its affirmance of the principles set forth in California Motor Transport, the Court in Bill Johnson's then went on to draw a distinction with respect to the NLRB's right to impose remedies for the filing of state-court lawsuits that were pending and those that had concluded in a judgment adverse to the plaintiffs. The latter lawsuits, the Court stated, did not receive the same broad immunity from NLRB action as the former. Once the plaintiff lost its lawsuit, the NLRB could "consider the matter further and, if it is found that the lawsuit was filed with retaliatory intent, . . . find a violation and order appropriate relief." Id. at 749. Such NLRB action was permissible because at that point "the employer has had its day in court,[and] the interest of the state in providing a forum for its citizens has been vindicated." Id. at 747. We would ordinarily be tempted to treat these statements in Bill Johnson's as dicta, because they were not pertinent to the case before the Court and because in Professional Real Estate Investors, decided ten years later, the Court did not even mention the Bill Johnson's statements when holding that unsuccessful lawsuits receive the traditional protection described in California Motor Transport, specifically including the requirement of objective baselessness.[18] Whatever we might otherwise make of the apparently contradictory positions announced by the Court, however, this circuit is not free to ignore the Bill Johnson's statements. On the basis of those statements, we have rejected an employer's argument that the NLRB erred in failing to determine whether a libel suit, which did not survive a demurrer in state court, was baseless. See Diamond Walnut Growers, Inc. v. NLRB, 53 F.3d 1085, 1088 (9th Cir. 1995). In that case we held that "bringing an action that proves unmeritorious may constitute an unfair labor practice, even though the suit did not lack a reasonable basis in law or fact at the time it was filed." Id. We are bound by Diamond Walnut and therefore by the Bill Johnson's statements.
 
 
 79
 Citing Bill Johnson's and Diamond Walnut , the HUD officials argue that a person would violate the FHA if he brought "an unsuccessful state court action to deter another person, or group of persons, from exercising their federally protected rights -e.g. to keep them from moving into the neighborhood." Because the plaintiffs ultimately lost their state-court lawsuit, the officials argue that they acted properly in investigating the plaintiffs' opposition to the Bel Air project to determine whether they had filed that action with a discriminatory motive.[19]
 
 
 80
 The HUD officials do not adequately explain why the Bill Johnson's and Diamond Walnut rule which is applicable in NLRA cases should apply with respect to the FHA or to other statutes generally. They contend that the holding in Professional Real Estate Investors is limited to the antitrust context, whereas the statements in Bill Johnson's establish the rule "for meritless state court suits in other contexts." The officials get the point exactly backwards. As we have discussed, this court has applied "the First Amendment rationale of the Noerr-Pennington doctrine" broadly to claims not involving antitrust law. See Manistee Town Ctr., 227 F.3d. at 1092 ; Boulware, 960 F.2d at 800; ONRC v. Mohla, 944 F.2d at 533-Indeed, in Evans v. County of Custer we cited Noerr in holding that "the first amendment's protection of the right to petition the government for redress of grievances" encompasses the right of homeowners to challenge such property-related decisions by local government as road access rules. 745 F.2d at 1204. Adopting the theory advanced by the HUD officials would thus conflict with our prior case law which protects the First Amendment right of citizens to engage in petitioning activity, including the filing of lawsuits with an objective basis in fact or law, even if they ultimately prove unsuccessful. Restricting the basic Noerr-Pennington principles to antitrust cases, as the HUD officials urge, would contravene our cases applying the Noerr-Pennington sham rule in all but the NLRA context.[20]
 
 
 81
 Indeed, it is the NLRA cases that we treat differently from all others with respect to the Noerr-Pennington "sham" exception. The reason is simple. The First Amendment rights of employers "in the context of [the] labor relations setting" are limited to an extent that would rarely, if ever, be tolerated in other contexts. See NLRB v. Gissel Packing Co. , 395 U.S. 575, 617 (1969). In Gissel Packing the Supreme Court held that employer speech that constitutes an unfair labor practice under the NLRA does not receive full First Amendment protection.[21] The employer's right of expression has to be balanced against "the equal rights of the employees to associate freely," giving special consideration to "the economic dependence of the employees on their employers." Id. at 617. See also NLRB v. Associated Gen. Contractors, Inc., 633 F.2d 766, 772 n.9 (9th Cir. 1980) ("Any attempt to reconcile an asserted governmental interest in disclosure with First Amendment rights must be made in the context of the labor relations setting. Association that would otherwise be protected may be regulated if necessary to protect substantial rights of employees or to preserve harmonious labor relations in the public interest.") (citation omitted). The NLRB is an agency charged with the regulation of union elections, the debate between employers and employees, and other related speech and conduct. Regulations controlling such expressive activity would almost certainly be invalid outside the labor relations setting.
 
 
 82
 In sum, the HUD officials would transform an exception that applies only to NLRB regulation of unfair labor practices into a rule of general applicability. They cite no cases that have so extended the Bill Johnson's "rule," and we have found none through our own research. Moreover, despite the present argument of the officials made for purposes of litigation, the director of HUD's Office of Investigations in Washington acknowledged, in finding no reasonable cause to proceed, that when a lawsuit is "premised on a reasonable basis in fact or in law," it is "protected by the First Amendment." We therefore conclude, as we have concluded in other contexts (including in the context of the petitioning activity of homeowners), that the principles embodied in the NoerrPennington doctrine apply to this case. That doctrine protects losing as well as winning lawsuits, so long as they are not objectively baseless. Thus, for the reasons explained earlier, the HUD officials' failure to investigate the objective basis for the plaintiffs' lawsuit rendered its investigation into the plaintiffs' advocacy unconstitutional.
 
 
 83
 4. Excessive Breadth of the Defendants' Investigation
 
 
 84
 As we have previously stated, there is a further reason why the investigation into the plaintiffs' First Amendment activity was violative of the plaintiffs' rights. Regardless of whether Noerr-Pennington or Bill Johnson's applies, the investigation far exceeded what was reasonable for the purpose of ascertaining the plaintiffs' motives for filing the statecourt suit and thus intruded unnecessarily on their First Amendment rights.
 
 
 85
 It is axiomatic that when the actions of government officials so directly affect citizens' First Amendment rights, the officials have a duty to take the least intrusive measures necessary to perform their assigned functions. See Lamont v. Postmaster Gen. of United States, 381 U.S. 301, 310 (1965) (Brennan, J., concurring) (citing Butler v. Michigan, 352 U.S. 380 (1957)); cf. Scott v. Rosenberg, 702 F.2d 1263, 1275 (9th Cir. 1983) (observing that although "[c]ertainly, governmental agencies must be wary of complaints which cannot be investigated without interfering with first amendment rights," investigation "in this case was narrow and avoided any unnecessary interference with the free exercise of religion"). The plaintiffs' reasons for opposing the Bel Air project were matters of public record and evident from the flyers in the San Francisco Office's possession before HRI even filed its complaint. There was simply no justification for the officials to take the extraordinarily intrusive and chilling measures they did during the subsequent eight-month investigation. There was no cause, for example, for defendant Zurowski to advise the plaintiffs during the conciliation process to "cease publication of discriminatory statements (including articles in the CNA Newsletter) and fliers about the potential residents of the Bel Air project"; even if the plaintiffs' suit had been objectively baseless, their non-threatening statements, "discriminatory" or not, would still have been fully protected by the First Amendment. There was no cause for defendants Smith and Lee to demand that the plaintiffs produce a list of the names, addresses, and telephone numbers of all involved parties and all witnesses to the expressive activity complained of, as well as copies of all files in their control concerning the Bel Air project. There was no cause for defendant Gillespie to assume the authority to investigate speech because it advocated discrimination against persons afforded benefits by the Fair Housing Act. There was also no cause for defendant Phillips to tell the San Francisco Examiner (if he did) that the plaintiffs "had broken the law."
 
 
 86
 The HUD officials' conduct cannot be squared with the First Amendment, no matter what rule is applied in evaluating the filing of the state-court lawsuit. The breadth of the investigation and the measures the officials took during its course bore no relation to the narrow purpose on which they now rely. The scope and manner of the investigation violated the plaintiffs' First Amendment rights.
 
 
 87
 C. Was the Law Clearly Established?
 
 
 88
 Having concluded that the plaintiffs have stated a proper First Amendment claim, we next consider whether the HUD officials are entitled to qualified immunity. Under this doctrine, government officials sued for damages for injuries arising out the performance of their discretionary functions must be "shown to have violated `clearly established statutory or constitutional rights of which a reasonable person would have known.' " Conn v. Gabbert, 526 U.S. at 290 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Closely analogous preexisting case law is not required to show that a right was clearly established. Schwenk, 204 F.3d at 1198; Mendoza v. Block, 27 F.3d 1357, 1361 (9th Cir. 1994); Alexander v. Perrill, 916 F.2d 1392, 1398 (9th Cir. 1990). As the Supreme Court has explained, "qualified immunity seeks to ensure that defendants `reasonably can anticipate when their conduct may give rise to liability,' by attaching liability only if `[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " United States v. Lanier, 520 U.S. 259, 270 (1997) (citations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citations omitted). In analyzing a claim of qualified immunity, this court asks two related questions: (1) Was the law governing the officials' conduct clearly established? and (2) Under that law, could a reasonable official have believed the conduct lawful? See, e.g., Ortega v. O'Connor, 146 F.3d 1149, 1154 (9th Cir. 1998); Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir. 1993).[22]
 
 
 89
 We hold that in this case the unconstitutionality of each of the HUD officials' actions was apparent at the time they acted. The plaintiffs' claim is founded on bedrock First Amendment principles and legal rules that this court and the Supreme Court have applied for decades, if not centuries. In 1993 and 1994, reasonable government officials would have known that they could not conduct an eight-month investigation into the vocal but entirely peaceful opposition of residents to a housing project proposed for their neighborhood, or into their efforts to persuade the appropriate government agencies of their point of view. They would also have known that accusations of law-breaking, threatened subpoenas, improper broad demands for documents and information, and admonishments to cease nonfrivolous litigation and the publication of "discriminatory" statements would chill "uninhibited, robust, and wide-open" debate on public issues. See New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). The HUD officials could not have reasonably believed their actions (as described at p. 12459 supra and in the Statement of Facts) to be consistent with the First Amendment.[23] See cases cited in Section I.B.1., supra.
 
 
 90
 The officials argue that they were required by statutes and regulations to serve HRI's complaint on the plaintiffs, conduct an investigation, and attempt to resolve it through conciliation. The fact that an investigation may have been initiated pursuant to statutory and regulatory authority does not, however, entitle the defendants to qualified immunity regarding the extent of the investigation and the manner in which it was conducted. See, e.g., Calabretta, 189 F.3d at 817 (stating that it was "not clear" why authorization under state regulations would excuse officials "from compliance with the Fourth Amendment"). It is the scope and manner of the investigation that the HUD officials should have known to be violative of the plaintiffs' First Amendment rights.
 
 
 91
 It was also clearly established that the Noerr-Pennington doctrine sharply limited the officials' ability to treat the plaintiffs' state-court lawsuit as a possible violation of law. Controlling case law had made clear that the doctrine was not limited to the antitrust context, and that the officials had a duty to first determine that the plaintiffs' suit -the only conceivable FHA violation alleged in HRI's administrative complaint -was objectively baseless before proceeding with a potentially chilling investigation into the plaintiffs' indisputably protected speech and other petitioning activity. See cases cited in Section I.B.3., supra.
 
 
 92
 The HUD officials--or, to be more specific, their counsel from the U.S. Department of Justice--contend that they will face the specter of "personal financial ruin" in the event that they are denied qualified immunity. The appropriate amount of damages to be awarded for the injuries sustained by the plaintiffs will be an issue for the jury or judge on remand; we express no opinion on that subject now. We observe only that Bivens suits against individual officials are often the only available means by which citizens may obtain remedies when the federal government violates their constitutional rights. To the extent that HUD is genuinely concerned about the inhibiting effect that the threat of personal liability will have on its future operations, it may indemnify its employees as permitted by law. We would, in fact, be most surprised if the agency did not do so in this case. When government officials violate citizens' clearly established First Amendment rights, however, we will not apply the doctrine of qualified immunity to defeat a remedy of damages to which the citizens are entitled under Bivens.
 
 II. PARTIAL SUMMARY JUDGMENT ON LIABILITY
 
 93
 The HUD officials ask us to review the district court's decision granting the plaintiffs summary judgment on the issue of liability. Under Federal Rule of Civil Procedure 56(c), a court may award a partial summary judgment that decides only that issue. The district court did so here. The court cited the following conduct as establishing liability: 1) defendant Smith's supervision of Lee and Zurowski and his specific direction that Lee ask the plaintiffs questions about their opposition to the Bel Air project, questions which Lee considered irregular and beyond the scope of a routine FHA investigation; 2) defendant Lee's work as the investigator on the case; 3) the offer made by defendant Zurowski "to terminate the investigation if the plaintiffs agreed to relinquish their constitutionally protected expressive activities"; and 4) defendant Gillespie's review and approval of the final investigative report. "In participating and contributing to the HUD investigation," the court stated, "each of these defendants engaged in conduct which impermissibly chilled the plaintiffs' First Amendment activities."
 
 
 94
 The plaintiffs argue that we do not have jurisdiction to review this ruling. In general, orders granting partial summary judgment are not appealable final orders under 28 U.S.C. 1291 "because partial summary judgment orders do not dispose of all claims and do not end the litigation on the merits." Williamson v. UNUM Life Ins. Co. of America, 160 F.3d 1247, 1250 (9th Cir. 1998) (citations omitted). We conclude, however, that special circumstances exist in this case that permit us to review the award of partial summary judgment, and to leave for trial, with respect to these four defendants, only the issue of damages.
 
 
 95
 As explained earlier, we have jurisdiction to review on interlocutory appeal the district court's decision denying the officials summary judgment on the defense of qualified immunity. We also have jurisdiction to review at the same time other issues that are "inextricably intertwined" with the question of qualified immunity. See Swint v. Chambers County Comm'n, 514 U.S. 42, 51 (1995); Mendocino Environmental Ctr., 192 F.3d at 1296. In Marks v. Clarke, 102 F.3d 1012 (9th Cir. 1996), we concluded that we had jurisdiction to review the district court's rulings granting partial summary judgment on liability which, we found, were "unquestionably inextricably intertwined" with the district court's decision to deny the defendants qualified immunity. Id. at 1018.
 
 
 96
 In reviewing the plaintiffs' qualified immunity appeal under the methodology mandated by the Supreme Court, we have already found that the plaintiffs stated a valid claim for a violation of their First Amendment rights. We recognize, however, that an interlocutory appeal of a denial of summary judgment as to the defense of qualified immunity necessarily involves only issues of law, see Johnson, 515 U.S. at 319, while an appeal from a grant of partial summary judgment on the merits may well involve disputed factual issues or even additional or different questions of law.
 
 
 97
 In the case before us the material facts as to defendants Smith, Lee, Zurowski, and Gillespie are undisputed, as a result primarily of the parties' commendable submission to the district judge of a comprehensive joint statement of undisputed facts. Moreover, the principal issues of law involved in the partial summary judgment appeal have necessarily all been resolved by our qualified immunity determination. It is clear from that determination, moreover, that the conduct of each of these defendants violated the plaintiffs' constitutional rights. Accordingly, we conclude that here the two issues on appeal are sufficiently "inextricably intertwined " to justify our exercise of jurisdiction over them both. Cf. Huskey v. City of San Jose, 204 F.3d 893, 904-05 (9th Cir. 2000) (exercising interlocutory appellate jurisdiction to find city not liable where its liability was based solely on liability of individual officials and qualified immunity analysis showed that plaintiff had not stated proper constitutional claim).
 
 
 98
 The four HUD officials argue that the partial summary judgment ruling was erroneous because there are "factual issues that remain despite the joint statement of undisputed facts." They make two specific points. First, they argue that "whether the plaintiffs were in fact chilled in the exercise of the speech is a disputed question for the jury." The dispute, if there were one, would not be material. In making their First Amendment claim, the plaintiffs were obligated to prove only that the officials' actions would have chilled or silenced "a person of ordinary firmness from future First Amendment activities," not that their speech and petitioning were "actually inhibited or suppressed." Mendocino Environmental Ctr., 192 F.3d at 1300 (citation omitted). In any event, the officials point to no evidence in the record that disputes the assertions in the plaintiffs' declarations that their rights were in fact chilled. The officials did not submit excerpts of any depositions of the plaintiffs, or any other evidence tending to undermine the plaintiffs' credibility on this point. While, on remand, the officials will certainly be entitled to challenge the extent of the injury suffered by the plaintiffs for purposes of determining damages, the fact that the plaintiffs incurred First Amendment injury is not a matter in genuine dispute.
 
 
 99
 Second, the officials contend that the district court "plainly erred" in entering a finding of liability against defendant Zurowski. The joint statement of undisputed facts states only that Zurowski conveyed to the plaintiffs HRI's conciliation proposal demanding that the plaintiffs cease all litigation and "publication of discriminatory statements (including articles in the CNA Newsletter) and fliers about the potential residents of the Bel Air Project." The officials argue that a government official's mere conveyance of a settlement offer, even one containing patently unconstitutional terms, does not violate the First Amendment. We need not decide this question because it is also undisputed that Zurowski advised David Bryden, the attorney then representing the plaintiffs, to accept the unconstitutional conciliation proposal because, Zurowski said, HUD had already collected evidence that the plaintiffs had violated the FHA. Such official action, we have already held, was sufficiently chilling to establish liability under the First Amendment.
 
 
 100
 The HUD officials repeatedly contend in their briefs that the assertion, set forth in a declaration by attorney Bryden, that Zurowski endorsed the conciliation proposal, is "disputed" and therefore an improper basis for an award of summary judgment. At oral argument, however, counsel conceded that the record contains no evidence that disputes Bryden's assertion -not even a declaration from Zurowski denying that the conversation as reported by Bryden took place. In civil rights cases, as in all others, summary judgment can work both for and against the government. Rule 56(e) provides that"[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." We may not reverse an award of partial summary judgment simply because the government asserts, without evidence in the record, that a critical fact is disputed.
 
 
 101
 Resolving all inferences from the evidence in the four officials' favor, we conclude that it was not error for the district court to award the plaintiffs partial summary judgment on the issue of liability.[24]
 
 
 102
 III. DISMISSAL OF CLAIM FOR PROSPECTIVE RELIEF
 
 
 103
 Lastly, we consider the plaintiffs' cross-appeal of the district court's dismissal of their claim for declaratory and injunctive relief. The HUD officials moved for dismissal on the alternative grounds of standing and mootness. Because standing and mootness both pertain to a federal court's subject-matter jurisdiction under Article III, they are properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6). See, e.g. , Bland v. Fessler, 88 F.3d 729, 732 n.4 (9th Cir. 1996) (citing Gemtel Corp. v. Community Redevelopment Agency, 23 F.3d 1542, 1544 n.1 (9th Cir. 1994)). We review a Rule 12(b)(1) order of dismissal de novo. Virgin v. County of San Luis Obispo, 201 F.3d 1141, 1142 (9th Cir. 2000) (citing Crist v. Leippe, 138 F.3d 801, 803 (9th Cir.1998)).
 
 
 104
 Rule 12(b)(1) jurisdictional attacks can be either facial or factual. See 2 James Wm. Moore et al., Moore's Federal Practice P 12.30[4], at 12-38 to 12-41 (3d ed. 1999). Here, the officials' facial attack on the plaintiffs' amended complaint fails. The plaintiffs alleged their desire "to continue to be vocal opponents of government housing projects"; the planning of other housing projects involving groups protected under the FHA against which the plaintiffs wished to advocate; and the continued efforts of HUD officials "to pursue and regulate protected speech" in the manner that occurred with respect to the Bel Air project. These allegations established "a likelihood of future injury" sufficient to give the plaintiffs standing to seek declaratory and injunctive relief. See Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1044 (9th Cir. 1999).
 
 
 105
 With a factual Rule 12(b)(1) attack, however, a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment. Gemtel Corp., 23 F.3d at 1544 n.1 (citing Mack v. South Bay Beer Distribs., Inc., 798 F.2d 1279, 1282 (9th Cir. 1986)). It also need not presume the truthfulness of the plaintiffs' allegations. Moore's Federal Practice, supra , P 12.30[4], at 1238.
 
 
 106
 In evaluating the officials' factual attack here, the district court considered the following items: (1) a memorandum issued by Roberta Achtenberg, Assistant Secretary for FHEO, dated April 3, 1995, and titled "Substantive and Procedural Limitations on Filing and Investigating Fair Housing Act Complaints That May Implicate the First Amendment" ("Achtenberg memorandum"); (2) a press release and statement dated September 2, 1994, announcing HUD's distribution to employees of "specific guidelines on speech and activities protected by the First Amendment"; and (3) a field handbook for FHEO staff dated September 1995 incorporating the substance of the Achtenberg memorandum. The press release stated that HUD had "moved to develop " its guidelines in response to its investigation of plaintiffs White, Deringer, and Graham. This investigation, the release stated, had resulted in a finding "that the trio's activities in opposition to the project had not violated the Fair Housing Act because they were protected free speech under the Constitution's First Amendment."
 
 
 107
 The Achtenberg memorandum prohibits HUD officials from accepting for filing or investigating any complaint involving public activities that "are directed toward achieving action by a governmental entity or officials" and "do not involve force, physical harm, or a clear threat of force or physical harm to one or more individuals." It lists examples of protected speech activity and provides that "any investigation which may be necessary to obtain information about the extent to which the First Amendment may be applicable should be prompt, narrowly tailored to gather sufficient preliminary data to allow such a decision to be made, and conducted in close consultation with counsel." It prohibits document requests that seek "membership lists, fundraising information or financial data of an organization that is or may be engaging in protected speech activities," and the preparation or transmission of conciliation proposals "that would circumscribe the First Amendment rights of any party to the complaint." The Achtenberg memorandum also states that a "lawsuit which is frivolous can be a violation of the Act." While it does not define this standard or discuss the First Amendment concerns involved with respect to the filing of nonfrivolous suits, the memorandum provides that "given the sensitivity and complexity of the issues relating to such litigation, all situations involving claims that litigation amounts to a violation of [S 3617 of the FHA] must be cleared with Headquarters before the complaint is filed." More broadly, the memorandum states that where FHA concerns "intersect with First Amendment protections," HUD officials must defer to the latter: "the Department chooses to err on the side of the First Amendment."
 
 
 108
 The HUD officials argue that in light of these materials, the district court erred in declining to dismiss the plaintiffs' request for injunctive relief on the ground of standing. We disagree. Standing is examined at "the commencement of the litigation." See Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc., _______ U.S. _______, _______, 120 S. Ct. 693, 698-99 (2000). At the time the plaintiffs' filed their complaint, the Achtenberg memorandum had been in effect for only a month and was scheduled to expire in less than a year. The recent implementation of such a temporary policy was insufficient to eliminate the plaintiffs' standing to seek prospective relief. As this case has progressed, however, the policy has become entrenched. It was therefore appropriate for the district court to analyze the officials' factual Rule 12(b)(1) challenge as a question of mootness, not standing.
 
 
 109
 The Supreme Court has made clear that the standard for proving that a case has been mooted by a defendant's voluntary conduct is "stringent":
 
 
 110
 "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968). The "heavy burden of persua[ding]" the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness. Id.
 
 
 111
 Friends of the Earth, 120 S. Ct. at 708 (citations modified). See also United States v. W.T. Grant Co., 345 U.S. 629, 63233 (1953). The Court specifically observed that a government agency's moratorium that "by its terms was not permanent" would not moot "an otherwise valid claim for injunctive relief." Friends of the Earth, 120 S. Ct. at 709. Here, however, it is clear that the Achtenberg memorandum represents a permanent change in the way HUD conducts FHA investigations, not a temporary policy that the agency will refute once this litigation has concluded. The memorandum is broad in scope and unequivocal in tone. It is fully supportive of First Amendment rights. Further, it addresses all of the objectionable measures that HUD officials took against the plaintiffs in this case, and even confesses that this case was the catalyst for the agency's adoption of the new policy. HUD has renewed the Achtenberg memorandum on a yearly basis,[25] and since its implementation the agency's officials have not engaged in conduct similar to that challenged by the plaintiffs here.[26]
 
 
 112
 Because HUD has met its heavy burden of proving that the challenged conduct cannot reasonably be expected to recur, we agree that the plaintiffs' claim for prospective relief is moot.[27]
 
 CONCLUSION
 
 113
 For the reasons stated, we affirm all the rulings of the district court challenged on the appeals and cross-appeal.
 
 AFFIRMED
 
 
 Notes:
 
 
 [1]
 As to one defendant, there are other issues, but they in no way affect this opinion.
 
 
 [2]
 Although the stipulated facts state that the "approval" of the City Council was required, the remainder of the stipulation and record make it clear that the Council had the authority to reject the Zoning Adjustment Board's decision to issue a permit but was not required to grant affirmative approval.
 
 
 [3]
 This letter stated in part:
 A small well-funded group of neighborhood homeowners, in concert with a political organization, has effectively blocked the project to date. They have been particularly successful in building opposition through scare tactics, as is evidenced in their literature. One of their principal arguments against this project is that it will benefit people that are diagnosed as mentally disabled or disabled through substance abuse. . . . Although we have encountered resistance on other affordable housing projects, it has never been so strong, nor so clearly discriminatory. Also, we are disturbed by the fact that these neighbors are backed by a political organization (the Council of Neighborhood Associations, or CNA).
 
 
 [4]
 The flyers made a variety of points about the project. One, titled "Who are the Homeless?", showed a pie chart dividing the homeless into three, presumably discrete categories -economic, mentally ill, and substance abusers -and complained about the "inequitable distribution" of Berkeley housing and services for the homeless in poor areas or commercial corridors "with high ethnic concentrations." Another listed projects planned for the area near the intersection of University and Shattuck Avenues, stated that these projects would provide beds for"90 mentally ill and 90 `stabilized' substance abusers," and concluded, "This is commercial suicide! Impacts MUST be assessed!" A third flyer contended that inadequate information had been provided about the Bel Air project for the Berkeley City Council to make a "fair, complete and proper evaluation"; regarding the project's tenant population, it stated, "At least 71% will be homeless, but no details as to mentally ill, substance abusers, dual diagnosis, etc."
 
 
 [5]
 With respect to possible penalties, each letter specified: "In an administrative law proceeding, if the judgement is for the complainant, remedies include injunctive relief, actual damages, and civil penalties up to $10,000 for a first offense, or $50,000 for multiple offenses. If the matter is referred to a U.S. District Court, remedies include injunctive relief, actual and punitive damages, and civil penalties up to $50,000 for a first offense, or $100,000 for multiple offenses. Under Section 813, the complainant also retains the right to bring an individual lawsuit under the Federal Fair Housing Law. . . ."
 
 
 [6]
 Counsel for the HUD officials contend that this assertion by Bryden is "disputed" and therefore cannot support the district judgment's grant of summary judgment for the plaintiffs on the issue of liability. At oral argument, however, counsel admitted that the record does not contain any evidence disputing this assertion.
 
 
 [7]
 It is clear that in granting the plaintiffs' motion for partial summary judgment against defendants Lee, Smith, Zurowski, and Gillespie on the issue of liability, the district court held that as a matter of law these defendants were not entitled to qualified immunity. Therefore, as to these defendants,we disregard as inconsistent with the court's clear holding its statement that the qualified immunity inquiry, "one of reasonableness, . . . remains a question of fact for the trier of fact. " As to Phillips, factual issues may remain for trial.
 
 
 [8]
 See also Laird v. Tatum, 408 U.S. 1, 12-13 (1972) ("[G]overnmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights."); American Communications Ass'n, C.I.O. v. Douds, 339 U.S. 382, 402 (1950) ("[T]he fact that no direct restraint or punishment is imposed upon speech or assembly does not determine the free speech question. Under some circumstances, indirect `discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions, or taxes.").
 
 
 [9]
 In NAACP v. Alabama ex rel. Patterson, the Supreme Court observed that the "compelled disclosure" of a controversial group's membership is "likely to affect adversely the ability of [the group] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate." 357 U.S. at 462-63.
 
 
 [10]
 As to Phillips, there may be a factual issue as to whether he made the statement at issue. For purposes of considering the denial of his motion for summary judgment on his qualified immunity defense, we must assume the facts as asserted by the plaintiffs.
 
 
 [11]
 The FHA's prohibitions were expanded to include discrimination based on familial status and handicap in the Fair Housing Amendments Act of 1988 (FHAA), Pub. L. No. 100-430, 102 Stat. 1619 (1988). A person is considered handicapped under the FHA if he has a physical or mental impairment (including "mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism") that substantially limits one or more major life activities. 24 C.F.R. 100.201. The FHAA also made violations of 3617 "discriminatory housing practices " under 3602(f), which HUD may investigate under 3610.
 
 
 [12]
 HUD's notice must acknowledge the complainant's filing and advise him "of the time limits and choice of forums provided under this subchapter." 42 U.S.C. 3610(a)(1)(B)(i).
 
 
 [13]
 HUD's notice must identify to the respondents "the alleged discriminatory housing practice," provide a copy of the complaint, and advise them "of the procedural rights and obligations of respondents under this subchapter." 42 U.S.C. 3610(a)(1)(B)(ii).
 
 
 [14]
 We do not mean to imply that the converse is true. Whether or not Noerr-Pennington provides greater protection than the First Amendment is a question we need not consider in this case.
 
 
 [15]
 Nor do we decide whether lawsuits that challenge government conduct may ever be treated as "sham," even if objectively baseless. See Note, A Petition Clause Analysis of Suits Against the Government: Implications for Rule 11 Sanctions, 106 Harv. L. Rev. 1111, 1118 (1993). Cf. City of Long Beach v. Bozek, 645 P.2d 137, 31 Cal.3d 527 (1982), vacated, 459 U.S. 1095, reiterated, 661 P.2d 1072, 33 Cal.3d 727 (1983).
 
 
 [16]
 There is an exception to this rule that we discuss in Section I.B.3.b., infra. It is, however, not pertinent here.
 
 
 [17]
 Even though HRI's complaint was actually drafted by a HUD intake analyst, administrative complaints are normally interpreted generously to the complainant in statutory schemes "in which laymen, unassisted by trained lawyers, initiate the process." Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 397 (1982) (quoting Love v. Pullman Co., 404 U.S. 522, 527 (1972)).
 
 
 [18]
 Particularly notable is the fact that in Professional Real Estate Investors, the Court cited the holding in Bill Johnson's that "by analogy to Noerr's sham exception, . . . even an `improperly motivated' lawsuit may not be enjoined under the National Labor Relations Act as an unfair labor practice unless such litigation is `baseless.' " 508 U.S. at 59. However, rather than applying or even citing the subsequent Bill Johnson's statements regarding unsuccessful lawsuits, the Court emphasized that a litigant's failure to prevail did not establish the objective baselessness of his suit, and it proceeded to apply Noerr-Pennington immunity to an action that had in fact been defeated on summary judgment. Had the Court believed that the statements in Bill Johnson's had any effect, we would expect that it would have explained why it did not apply them in the case before it. The fact that the Court did not do so indicates that it considered the statements dicta.
 
 
 [19]
 The officials' investigation started in November 1993 and the state court did not enter judgment against the plaintiffs' coalition until February 3, 1994. Most of the investigation, however, occurred after that date.
 
 
 [20]
 We note, incidentally, that in the few published decisions in which lawsuits were claimed to constitute discriminatory housing practices, district courts have generally applied the Noerr-Pennington "objectively baseless" standard in evaluating First Amendment defenses. See, e.g., United States v. Wagner, 940 F. Supp. 972, 981-82 (N.D. Tex. 1996) (holding that suit to enforce restrictive covenant against group home for mentally retarded children "had no reasonable basis in law or fact," had been filed with discriminatory aims, and therefore violated FHA); United States v. Robinson, 3 Fair Hous.-Fair Lend. (P-H) P 15,979, at 15979.9 to 15979.12 (D. Conn. Jan. 26, 1995) (holding that neighbors' zoning action challenging proposed use of home for handicapped children was not baseless as matter of state law and was therefore protected by First Amendment).
 
 
 [21]
 In Gissel Packing the employer had conveyed, through speeches, leaflets, and letters, the message that it was in a precarious financial condition, that a strike would probably result in a plant shutdown, and that in such case the employees would have difficulty finding employment elsewhere. 395 U.S. at 619. The Court affirmed the NLRB's finding that these communications constituted a threat of retaliatory action unprotected by the First Amendment. Id. at 619-20.
 
 
 [22]
 Qualified immunity, we note, involves a purely objective inquiry. See Crawford-El v. Britton, 523 U.S. 574, 588 (1998); Harlow, 457 U.S. at 817-19. We therefore decline to consider either the plaintiffs' contention that the HUD officials "actually knew" that they were violating the First Amendment but were "testing" to see how far they could proceed against neighborhood protest groups under the FHA, or the officials' protestations they are "dedicated" public servants who acted "in good faith."
 
 
 [23]
 As to Phillips, our conclusion is based on the assumption that any disputed material facts are resolved in the plaintiffs' favor. See note 10, supra.
 
 
 [24]
 For the foregoing reasons, we also affirm the district court's denial of defendant Lee's motion for summary judgment on liability.
 
 
 [25]
 The HUD officials have submitted notices showing that the agency has extended the effective date of the Achtenberg memorandum five times since its implementation, most recently to April 30, 2001.
 
 
 [26]
 The declarations and newspaper articles that the plaintiffs presented in the district court in response to the defendants' motion to dismiss do not show that HUD has acted in a manner inconsistent with the Achtenberg memorandum's terms, and no contention is made that HUD has done so since that time.
 
 
 [27]
 On August 8, 1996, when the district court granted the officials' motion to dismiss the claim for prospective relief, the Achtenberg memorandum had been in effect for sixteen months. Whether or not the claim for prospective relief was moot as of that time, it is clearly moot now. See Arizonans for Official English v. Arizona, 520 U.S. 43, 66 (1997) (observing that "[t]o qualify as a case fit for federal-court adjudication, `an actual controversy must be extant at all stages of review,' " and holding that plaintiff's resignation from state job during appeal rendered her claim for prospective relief moot) (quoting Preiser v. Newkirk, 422 U.S. 395, 401 (1975)).